CRUFON CONSTRUCTION CORP., recurrida, *v.* AUTORIDAD DE EDIFICIOS PÚBLICOS, peticionaria.

*Número:* CC-2000-459     *Resuelto:* 11 de febrero de 2002

*Enrique R. Adames Soto*, abogado de la peticionaria; *Jorge Lora Longoria* y *Luis F. Juarbe Jiménez*, abogados de la peticionaria; *Rebeca Barnés Rosich*, abogada de la recurrida.

EL JUEZ ASOCIADO SEÑOR CORRADA DEL RÍO emitió la opinión del Tribunal.

## I

La peticionaria, Autoridad de Edificios Públicos (Autoridad), celebró unas subastas públicas, en fechas distintas, para la concesión de tres contratos de construcción de las escuelas públicas siguientes: Naguabo High School, Las Piedras High School y la Escuela Intermedia Dr. Felipe García, en Camuy. Una vez celebradas las subastas, la Autoridad emitió las resoluciones correspondientes para adjudicar los proyectos al postor más bajo, como corresponde en ley: Crufon Construction Corp. (Crufon), corporación aquí recurrida. Posteriormente se otorgaron y suscribieron los contratos, estipulando en ellos un precio alzado por la labor que se realizaría.[1] Mediante dichos contratos, Crufon acordó no tan sólo edificar las estructuras, sino también proveer todos los materiales, el equipo, la maquinaria, la mano de obra y, en fin, todos aquellos servicios que, según la práctica y costumbre, son necesarios para que dichos proyectos sean ejecutados.

El salario mínimo en vigor al momento de firmar los contratos era de $4.25 por hora. Sin embargo, el 20 de agosto de 1996, es decir, aproximadamente siete meses luego de haberse firmado el último de dichos contratos, el Congreso de Estados Unidos aprobó una legislación con el fin de proveer un aumento paulatino al salario mínimo federal, mediante una enmienda a la ley de salario mínimo.[2] Mediante dicha ley se dispuso que el salario mínimo federal ascendería a razón de $4.75 por hora a partir

---

[1] El 31 de octubre de 1994 se suscribió el contrato para el proyecto de Naguabo High School por el precio alzado de $4,195,000; el 29 de noviembre de 1995 se firmó el de Las Piedras High School por un precio alzado de $3,282,000, y el 5 de enero de 1996 se firmó el de la Escuela Intermedia Dr. Felipe García, en Camuy, por $3,547,000.

[2] Véase Pub.L. No. 104–188, Title II, secs. 2104(b) y (c), 2105(c), 110 Stat. 1928, 1929, 29 U.S.C.A. sec. 206.

del 1ro de octubre de 1996, y luego a $5.15 a partir del 1ro de septiembre de 1997. El aumento, desde luego, sería de aplicación a los patronos en Puerto Rico en virtud de la Ley Núm. 96 de 26 de junio de 1956, según enmendada, conocida como Ley de Salario Mínimo de Puerto Rico.[3]

Así las cosas, el 14 de octubre de 1996 Crufon envió una primera comunicación escrita al Director de Área de Construcción de la Autoridad. En ella le planteó que la aprobación de dicha legislación federal implicaba inevitablemente un aumento en gastos para la mano de obra que emplearía Crufon en los proyectos de construcción. Solicitó que se resolviera "la forma del pago". Para ello sugirió varias alternativas a considerar y, a través de la misiva, "somet[ió su] petición formalmente de manera que [se pudiera] ir buscando los mecanismos para que no se convierta en una carga para aquellos" que tenían varios proyectos con la Autoridad.[4] El 2 de octubre de 1997 el Director Ejecutivo de la Autoridad denegó dicha petición.

El 24 de octubre de 1997 Crufon solicitó que se sometiera dicha controversia al procedimiento de arbitraje dispuesto en los contratos. Asimismo, en marzo de 1998 Crufon volvió a requerirle a la Autoridad una compensación adicional para la construcción de las tres escuelas.

El 17 de abril de 1998 Crufon suscribió un relevo de responsabilidad a favor de la Autoridad en cuanto a toda reclamación de cualquier índole, ya fuera pasada, presente o futura, en relación con la ejecución, los pagos y las alteraciones del proyecto de la escuela de Naguabo. Para esta fecha, la Autoridad aún no había contestado la última petición de Crufon sobre la compensación adicional para la construcción de las escuelas.

No obstante, la Autoridad replicó mediante una carta, el 18 de mayo de 1998, en la cual denegó nuevamente la solicitud de Crufon. En ella expresó que:

---

[3] 29 L.P.R.A. sec. 245 *et seq.*

[4] Véase Apéndice, págs. 175–177.

La posición oficial de la [Autoridad] en el presente asunto es no reconocer la reclamación presentada. El impacto que puede tener dicho aumento le concierne exclusivamente al contratista constituyendo un riesgo inherente a la operación de su negocio.

. . . . . . . .

La legislación de salario mínimo es una de carácter recurrente, por lo que es fácilmente previsible la ocurrencia de la misma durante la vigencia del contrato. Las compañías que tienen experiencia en este tipo de contrato saben de antemano que una vez terminan de implementar los aumentos en salario mínimo establecidos por una ley, se legisla nuevamente un aumento en el salario mínimo, ya sea para aplicación inmediata o escalonadamente en años subsiguientes. Aunque no sea posible determinar la cantidad exacta que conlleva dicho aumento, si es previsible que surgirá, e incluir en el contrato una cláusula específica para lidiar con esa contingencia, de ésta ocurrir. En ausencia de esta provisión, le corresponde al contratista asumir el impacto que pueda ocasionar el aumento en salario mínimo en la operación del negocio. (Énfasis suprimido.)[5]

Así pues, la Autoridad denegó la solicitud de compensación adicional por el aumento en costo de la construcción de las tres escuelas.[6]

En vista de todo lo anterior, Crufon decidió presentar ante el Tribunal de Primera Instancia (T.P.I.) una "Demanda para obligar a arbitraje mediante procedimiento sumario".[7] Alegó que, de acuerdo con el Art. 15.2 de las Condiciones Generales para la Contratación de Obras Públicas de 27 de octubre de 1976 (Condiciones Generales), la adjudicación de la obligación del pago por el aumento en costo de la construcción de las tres escuelas requería dilucidarse mediante arbitraje. A esos efectos, sometió además el nombre de un árbitro.

---

[5] Apéndice, págs. 178–179.

[6] Cabe señalar, sin embargo, que la Autoridad de Edificios Públicos (Autoridad) nada expresó en cuanto al relevo de responsabilidad suscrito por Crufon Construction Corp. (Crufon), y sus posibles efectos sobre la reclamación por aumento en costos relacionada al proyecto de la escuela de Naguabo.

[7] Apéndice, pág. 323.

Subsiguientemente, la Autoridad presentó su contestación. Sostuvo primero que, conforme a derecho y a los contratos suscritos entre las partes, la Autoridad no venía obligada a pagar cantidad alguna al demandante por concepto del incremento en el salario mínimo de los empleados de Crufon. Como defensa, afirmó que la controversia de autos no era arbitrable al amparo de los términos de los contratos otorgados y que, de todos modos, ya había sido resuelta mediante una determinación administrativa final y firme.

Trabado el pleito, Crufon procedió a solicitar que se dictara sentencia sumaria a su favor. La Autoridad se opuso oportunamente. Así las cosas, el 15 de octubre de 1999 el T.P.I. dictó una sentencia sumaria a favor de Crufon. En consecuencia, ordenó que se sometiera a arbitraje la reclamación de compensación por los gastos adicionales en que ésta había incurrido en la mano de obra de los proyectos de construcción de las escuelas, tras producirse la enmienda a la ley de salario mínimo federal.

Inconforme, la Autoridad acudió ante el Tribunal de Circuito de Apelaciones (T.C.A.). Amparándose en el Art. 3.2.9 de las Condiciones Generales, el foro apelativo sostuvo que la disputa de marras, en síntesis, se refería "al costo o cambio en el precio del contrato" (énfasis suprimido), por lo cual toda decisión final estaría sujeta a un procedimiento de arbitraje. En vista de ello, emitió una Resolución el 7 de abril de 1999 que confirmó la sentencia sumaria dictada por el foro de instancia.

Insatisfecha con dicha determinación, la Autoridad acude ante nos formulando los señalamientos de error siguientes:

A. Erró el Honorable Tribunal de Circuito de Apelaciones al resolver que la reclamación de Crufon es arbitrable al amparo del contrato de construcción otorgado con la A.E.P. y las Condiciones Generales para la Contratación de Obras Públicas Insulares.

B. Erró el Honorable Tribunal de Circuito de Apelaciones al

resolver que la reclamación de Crufon es arbitrable a pesar del craso incumplimiento de ésta con el procedimiento y términos de notificación para presentar su reclamación y solicitud de arbitraje.

C. Erró el Honorable Tribunal de Circuito de Apelaciones al resolver que es arbitrable al amparo de las Condiciones Generales para la Contratación de Obras Públicas Insulares, la validez y/o el efecto sobre la reclamación de Crufon del relevo total otorgado por [é]sta para el proyecto Naguabo High School. Petición de *certiorari*, pág. 9.

Mediante Resolución de 23 de junio de 2000, denegamos el recurso. Una vez presentada por la Autoridad una moción de reconsideración el 11 de julio de 2000, reconsideramos nuestro dictamen y, mediante Resolución de 6 de octubre de 2000, expedimos el presente auto de *certiorari*. Al contar con la comparecencia de ambas partes, resolvemos.

## II

La ley local de arbitraje dispone que dos o más partes podrán convenir por escrito el someter a arbitraje cualquier controversia que pudiera ser objeto de una acción existente entre ellos a la fecha de dicho convenio, o podrán incluir en un convenio por escrito una disposición para arreglar mediante arbitraje cualquier controversia que en el futuro surgiese entre ellos de dicho acuerdo o en relación con él. Tal convenio será válido, exigible e irrevocable, salvo por los fundamentos que existan en derecho para su revocación.[8] Añade el Art. 4 de la mencionada ley:

... Cualquiera de las partes de un convenio por escrito de arbitraje que alegare la negligencia o negativa de otra a proceder a un arbitraje de conformidad con el convenio podrá solicitar del tribunal una orden obligando a las partes a proceder a arbitraje de conformidad con el convenio entre ellas. 32 L.P.R.A. sec. 3204.

---

[8] Ley Núm. 376 de 8 de mayo de 1951 (32 L.P.R.A. sec. 3201 *et seq.*).

■ Sin embargo, aun cuando en Puerto Rico existe una fuerte política pública que favorece el arbitraje de controversias, este mecanismo se utilizará sólo si las partes así lo han pactado y en la forma en que lo hayan pactado. A su vez, la naturaleza y extensión de los poderes del árbitro están delimitadas por el lenguaje y la intención del acuerdo de arbitraje. Someter una controversia a arbitraje, es decir, la determinación de si un acuerdo crea el deber de las partes de arbitrar una controversia en particular, es tarea judicial. *World Films, Inc. v. Paramount Pict. Corp.*, 125 D.P.R. 352 (1990). Es función del tribunal, por lo tanto, auscultar la intención de las partes para determinar cuáles son las controversias que pactaron arbitrar, toda vez que siendo el arbitraje " 'un asunto contractual ... no se puede obligar a una parte a someter a arbitraje una disputa que dicha parte no ha acordado someter' ". *Mun. de Ponce v. Gobernador*, 136 D.P.R. 776, 783 esc. 1 (1994).

En el caso de autos las partes expresaron específicamente qué tipo de disputa iba a ser sometida a arbitraje. Por lo tanto, pasemos, pues, a determinar si la reclamación objeto de este pleito —dígase la reclamación de compensación adicional incoada por Crufon como resultado del incremento en el costo de mano de obra, dado el aumento en el salario mínimo federal— es arbitrable conforme la voluntad de las partes, a la luz de los contratos otorgados.

■ El Art. 3.2.9 de las Condiciones Generales[9] aplicables a los contratos suscritos por las partes, dispone:

> All disputes under this contract shall be decided by the Architect or Engineer whose decision shall be final and binding, *except disputes concerning the cost or amount of claims involving change in the contract price, which shall be decided by the*

---

[9] Las Condiciones Generales para la Contratación de Obras Públicas de 27 de octubre de 1976 (Condiciones Generales) deben considerarse como un estatuto que regula todo contrato de obra pública en Puerto Rico, por ser una reglamentación administrativa preparada en virtud de una delegación legislativa expresa. Al respecto, véase *Cristy & Sánchez v. ELA*, 84 D.P.R. 234 (1961).

*Architect or Engineer subject to arbitration* as specified in Article 15. (Énfasis nuestro.)

El Art. 15.2.1 de las referidas Condiciones Generales dispone, a su vez:

In case of any *dispute involving a change in contract price*, the party not satisfied with the Architect or Engineer's decision may request arbitration by filing a demand in writing with the Arquitect or Engineer within thirty (30) calendar days from the date of the decision. (Énfasis nuestro.)

De las citadas cláusulas podemos colegir que toda controversia surgida ente las partes a raíz de los contratos otorgados sería decidida de forma final por el arquitecto o ingeniero, excepto aquellas reclamaciones que versen sobre los cambios en el "precio del contrato", en cuyo caso la decisión del arquitecto o ingeniero podría someterse a arbitraje. Por lo tanto, nos corresponde determinar qué constituye un cambio en el precio del contrato.

El Art. 10.1.1 de las referidas Condiciones Generales define el término "precio del contrato":

The Contract Sum is the Contract Price as stated in the Agreement and is the total amount payable by the Owner to the Contractor for the performance of the Work under the Contract Documents subject to additions and deductions. The amount payable to the Contractor shall be the actual total cost of the work performed and accepted.

El "precio del contrato", según definido, es la cantidad pagada por el dueño de la obra al contratista por la ejecución del trabajo bajo los Documentos del Contrato, sujeto a adiciones y deducciones. Para determinar cuándo el precio del contrato podía ser modificado, es necesario evaluar el Art. 13.1.1 de las Condiciones Generales, el cual señala:

The Owner without invalidating the Contract may order extra work or make changes in the work within the general scope of the Contract consisting of additions, deletions of any or all of the quantities in the items of the Bid scheduled or

other revisions, the Contract sum and the Contract time being adjusted accordingly. All such alterations shall be authorized by Change Orders or Extra Work Orders and shall be executed under the applicable conditions of the Contract Documents.[10]

El T.C.A., al evaluar las cláusulas contractuales previamente citadas, concluyó que la controversia de autos era arbitrable puesto que la Autoridad, como dueña de la obra, podía emitir una orden de cambio (*change order*) no sólo para hacer variaciones al diseño pactado en el contrato, sino también para realizar algún ajuste en el precio y/o tiempo contractual por razón de alguna otra circunstancia ajena a dicha variación. Veamos.

■ Es muy frecuente en la industria de la construcción efectuar alteraciones durante la ejecución de la obra pactada. Tan es así, que es difícil encontrar un inmueble que haya sido construido ciñéndose exactamente al proyecto técnico. Cualquier construcción, independientemente de su complejidad, discrepa del proyecto original en que fue diseñada una vez terminada la obra. En ocasiones, se trata de que el proyecto está mal elaborado y es necesario corregirlo; en otras, el proyecto es correcto, pero es preciso introducir algunas obras no previstas en él, pero necesarias para llevarlo a cabo. En muchos casos se trata simplemente de que el dueño decide realizar modificaciones respecto del proyecto inicialmente convenido. M.A. Del Arco y M. Pons, *Derecho de la Construcción*, 2da ed., Madrid, Ed. Hesperia, 1987, págs. 205–206. A la luz de lo anterior, es común incluir en este tipo de contratos unas cláusulas que autoricen, previa notificación, modificaciones conocidas en el argot de la industria de la construcción como "órdenes de cambio" (*change orders*). En *Levy v. Aut. Edif. Públicos*, 135 D.P.R. 382, 384 (1994), señalamos que "[e]ste tipo de

---

[10] El Art. 13.1.2 de las Condiciones Generales dispone:

"A Change Order is a written order to the Contractor signed by the Owner or his representative, authorizing a change in the work or an adjustment in the Contract Sum and or the Contract Time."

órdenes puede emitirse 'bien para reducir o incrementar la construcción, ello conllevando reducción o incremento en el precio y ajustes porcentuales en las partidas de gastos fijos y ganancia ...' ".

Sobre la naturaleza de las órdenes de cambio, el *National Institute of Construction Law*[11] señala:

> In order to accommodate an owner's changing needs, which are virtually certain to occur, the parties may agree in advance that the owner can order changes within the general scope of the project. This agreement is often evidenced by inserting a changes clause into the construction contract. ... Thus, the owner may order changes in quantity, quality, or method without the consent of any other party to the contract.
>
> ...
>
> ... The contractor must also be further compensated if the change affects its cost or schedule or both.
>
> A "change order" must be signed by the owner, architect, and the contractor, and states their agreement upon the change in the work, the amount to be paid for the change, and the extent of the time adjustment, if any.

■ Al aplicar lo antes expuesto a la reclamación del caso de autos y al evaluar las disposiciones contractuales en controversia según la normativa jurídica prevaleciente[12] y la naturaleza de los contratos en cuestión, debemos concluir que erró el T.C.A. al resolver que cualquier disputa entre el contratista y el dueño de la obra relacionada al precio del contrato era arbitrable independientemente de la razón o circunstancia que provocara la reclamación. El aumento en precio es el que resulta de una orden de

---

[11] *Construction and Design Law*, Virginia, National Institute of Construction Law, 1996, Vol. II, Cap. 14, Sec. 14.3a, págs. 6–7.

[12] Véase Art. 1237 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3475. Nótese, además, que al momento de interpretar un contrato es preciso interpretarlo de manera tal que lleve a resultados conformes a la relación contractual. *S.L.G. Irizarry v. S.L.G. García*, 155 D.P.R. 713 (2001).

cambio o de una exigencia adicional que produce, a su vez, un aumento en los jornales o materiales. *Zequeira v. CRUV*, 83 D.P.R. 878 (1961). Las "adiciones" y "deducciones" a las que podía estar sujeto el precio del contrato sólo podían ser provocadas por un cambio o aumento en el trabajo pactado a consecuencia de una orden de cambio emitida por el dueño de la obra.

Por lo tanto, siendo arbitrables únicamente las controversias referentes a un cambio en el precio del contrato como consecuencia de una orden de cambio emitida por el dueño para alterar la naturaleza del trabajo originalmente pactado, y al no haber emitido la Autoridad una orden para que Crufon realizara un cambio en el trabajo o un trabajo adicional —el cual tuviese como consecuencia una variación en el precio originalmente pactado— forzoso es concluir que la reclamación de Crufon no es arbitrable. La reclamación de Crufon por el alegado aumento en el precio de los contratos está basada en circunstancias ajenas a cualquier orden de cambio u orden de trabajo adicional emitida por el dueño.

Es un hecho incontrovertido que las especificaciones de los contratos en cuestión permanecieron inalteradas por el dueño de la obra, la Autoridad. Siendo esto así, el contratista no tiene derecho a reclamar costos adicionales por no haber ocurrido un cambio en el precio del contrato; por ende, no hay disputa que arbitrar.

### III

Nos resulta, además, insoslayable el hacer referencia a la naturaleza de los contratos otorgados por las partes en la presente controversia. El contrato de obra a precio alzado consiste en señalar un monto por la totalidad de la ejecución de la obra, asumiendo el contratista los riesgos de la operación. El empresario se obliga a hacer

entrega de la obra, realizada en conformidad con un proyecto técnico previamente acordado por los contratantes y por un precio global también fijado previamente. El contrato de obra por ajuste alzado se caracteriza por la concurrencia de tres elementos: invariabilidad del precio, plano detallado y riesgo asumido por el contratista.[13]

Sobre este tipo de contrato, señala el Art. 1485 del Código Civil:

> El arquitecto o contratista que se encarga por un ajuste alzado de la construcción de un edificio u otra obra en vista de un plano convenido con el propietario del suelo no puede pedir aumento de precio *aunque se haya aumentado el de los jornales o materiales*, pero podrá hacerlo cuando se haya hecho algún cambio en el plano que produzca aumento de obra, siempre que hubiese dado su autorización el propietario. (Énfasis nuestro.)[14]

Este precepto se suele justificar en que el riesgo de aumento de costos es consustancial a la función empresarial del contratista, quien puede prevenir y evitar ese perjuicio mediante la estipulación contractual que admita la modificación de los costos unitarios en la ejecución (materiales, mano de obra, etc.), de forma que no influyan en el beneficio previsto, o mediante el pacto de las oportunas cláusulas de estabilización. M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1986, T. XX, Vol. 2, págs. 382–383.

Vemos, pues, que en este tipo de contrato, para todo lo que presumiblemente estaba contemplado y previsto, y que debía preverse al momento de contratar, el precio es definitivo y no puede ser aumentado en interés del empresario, aunque éste pruebe que se perjudicó.

En consecuencia, reafirmamos los pronunciamientos hechos en el caso *Méndez v. Jiménez, Comisionado*, 72 D.P.R.

---

[13] M.A. Del Arco y M. Pons, *Derecho de la Construcción*, 2da ed., Madrid, Ed. Hesperia, 1987, pág. 79.

[14] 31 L.P.R.A. sec. 4126.

335, 340 (1951), mediante el cual, ante una reclamación hecha por el contratista a raíz del aumento en el salario mínimo, en un contrato a precio alzado, señalamos:

> ... [S]iendo ése un riesgo a que está expuesto todo contratante, bien pudo el demandante al celebrar su contrato con El Pueblo de Puerto Rico, tomar las precauciones pertinentes para protegerse contra esa contingencia, pactando que cualquier aumento en los jornales que con motivo de una disposición legal se viere obligado a satisfacer, dicho aumento le fuese resarcido por El Pueblo de Puerto Rico. El demandante, pues, no tiene causa de acción contra el demandado.

Resolver en contrario a lo antes expuesto desvirtuaría la naturaleza del contrato de obras a precio alzado y le concedería al contratista la facultad de renegociar los términos del contrato por un acontecimiento que pudo haber sido previsto, oportunamente, al momento de contratar.

Habiéndose determinado la inaplicabilidad de la cláusula de arbitraje a la reclamación objeto del presente recurso, resulta inconsecuente la discusión de los otros errores invocados por el peticionario.

## IV

Por los fundamentos antes expuestos, *revocamos el dictamen del Tribunal de Circuito de Apelaciones y el del Tribunal de Primera Instancia, y decretamos que la reclamación instada por Crufon no es arbitrable. Ordenamos la desestimación de la demanda.*

*Se dictará la sentencia correspondiente.*