Municipio de Mayagüez, recurrido, *v.* Edgardo Lebrón h/n/c Lebrón & Associates, peticionario.

*Número:* AC-2004-37 *Resuelto:* 21 de abril de 2006

*Rebeca Barnés Rosich*, abogada de la parte apelante; *Carlos E. Cardona* y *Alberto O. Jiménez*, abogados de la parte apelada.

LA JUEZ ASOCIADA SEÑORA RODRÍGUEZ RODRÍGUEZ emitió la opinión del Tribunal.

Nos corresponde resolver si una disposición contractual sobre arbitraje es oponible a un municipio cuando ésta no formó parte del contrato de construcción entre el municipio y un particular, pero se incluyó en el documento de especificaciones conforme a las cuales, según el contrato, habría de realizarse la obra.

I

Los hechos de este caso surgieron a raíz de la remodelación del Palacio de Recreación y Deportes del Municipio de Mayagüez (Municipio). El 24 de enero de 1995, el Municipio contrató a la firma de arquitectos Rigau & Penabad para que preparase los documentos relacionados con la remodelación. Ésta preparó, entre otras cosas, un *Documento de Especificaciones*. En éste se incluyeron varios escritos modelos del American Institute of Architects (AIA); entre ellos, uno titulado *General Conditions of the Contract for Construction, AIA Document A201-1976* (Condiciones Generales o A201). Apéndice de la Apelación Civil (Apéndice), págs. 96–114.

El Municipio llevó a cabo en dos ocasiones el proceso de subasta para seleccionar al contratista de la remodelación. En ambas ocasiones las subastas fueron declaradas

desiertas. Antes de la segunda subasta, el Municipio informó a los interesados en el *aviso de subasta* que "[t]oda información necesaria, así como todos los documentos de contratos y modelos de proposición, podrán obtenerse en el Departamento de Conservación, Ornato y Desarrollo Urbano". Apéndice, pág. 906. En la reunión presubasta celebrada para este proyecto se indicó que "el libro de especificaciones que se preparó para la primera subasta de este proyecto, *está completamente vigente* y no se ve alterado en forma alguna como consecuencia de las revisiones a que se sometió el diseño". (Énfasis suplido.) Dicha aclaración consta en la correspondiente Minuta, cuyo contenido *"pasa a ser parte de las condiciones generales de las especificaciones técnicas del proyecto y, consecuentemente, de los documentos de subasta y construcción"*. (Énfasis suplido.) Apéndice, págs. 910–911.

Sin embargo, como indicamos, ambas subastas se declararon desiertas durante 1996,(1) pues hubo una sola licitación y ésta excedió los fondos disponibles. El peticionario, Edgardo Lebrón (Lebrón o peticionario), fue el único licitador en ambas ocasiones. Por ende, el 15 de noviembre de 1996 el Municipio autorizó que se atendiera el asunto administrativamente, y luego entró en negociaciones con el peticionario. Contrato de Construcción, Apéndice, págs. 64–75; Carta de 11 de marzo de 1996, Apéndice, pág. 907; Resolución Núm. 38, Serie 1996-1997, Apéndice, págs. 930–933.

Las partes otorgaron el 30 de mayo de 1997 un contrato de construcción. Éste disponía, en su primer artículo, que el Municipio

> ... contrata los servicios del [peticionario], para que realize [sic] la Primera Fase de las obras de Remodelación del Palacio de Recreación y Deportes de Mayagüez, *conforme se describe en los planos y especificaciones sometidos por el Departamento*

---

(1) Específicamente, durante el 1996 se notificó la cancelación de la primera subasta y se llevaron a cabo los procedimientos relacionados con la segunda subasta.

*de Conservación, Ornato y Desarrollo Urbano y aceptados por*
*el Contratista* .... (Énfasis nuestro.) Apéndice, pág. 64.[2]

No surge del referido contrato ninguna otra referencia
al Documento de Especificaciones ni al arbitraje.

Así las cosas, el peticionario presentó el documento *De-*
*mand for Arbitration* (Petición de Arbitraje) ante la Ame-
rican Arbitration Association el 2 de enero de 2002. Citó
como fuente para el arbitraje el Art. 7.9 de las Condiciones
Generales incluidas en el Documento de Especificaciones.
Apéndice, pág. 107. No existe controversia con respecto a
que dicho documento fue el que se utilizó durante el pro-
ceso de subastas y que Lebrón obtuvo su copia del Depar-
tamento de Conservación, Ornato y Desarrollo Urbano del
Municipio.

Ante la Petición de Arbitraje de Lebrón, el Municipio
acudió al Tribunal de Primera Instancia con una demanda
de "Petición de suspensión de arbitraje y solicitud de vista
inmediata" el 18 de marzo de 2002. Alegó que no existía
entre las partes un convenio de arbitraje. Apéndice, págs.
60–63.[3]

El Tribunal de Primera Instancia declaró "con lugar" la
demanda del Municipio, al concluir que no existía entre las
partes una obligación contractual de someterse al
arbitraje.[4] Insatisfecho, el peticionario acudió al Tribunal

---

[2] Este contrato cubrió sólo la primera de cuatro fases contempladas, sujetán-
dose las demás a la aprobación de fondos. Eventualmente, las partes enmendaron el
contrato de construcción, el 3 de agosto y 4 de diciembre de 1998, para incluir las
fases segunda, tercera y cuarta. Ambas enmiendas establecieron que permanecerían
vigentes las otras disposiciones del contrato original. Apéndice, págs. 64–75.

[3] El Municipio de Mayagüez (Municipio) apoyó su alegación al señalar, en
síntesis, que el contrato de construcción no contiene ni hace referencia a una cláu-
sula de arbitraje, que las partes nunca discutieron tal cláusula y que las Condiciones
Generales (*General Conditions of the Contract for Construction, AIA Document A201-
1976*) se incluyeron en el Documento de Especificaciones sin la autorización de un
funcionario o un particular con la facultad de vincular al Municipio al arbitraje.
Apéndice, págs. 60–63.

[4] En lo aquí pertinente, las determinaciones de hechos del juzgador, cuya ve-
racidad no cuestionamos, fueron las siguientes: (1) el contrato de construcción no
contiene una cláusula de arbitraje; (2) el plano y todo lo concerniente a las especifi-
caciones los preparó Rigau & Penabad, entidad que carecía de la facultad para obli-
gar al Municipio al arbitraje; (3) el arquitecto Iván Rigau fue quien incluyó las
Condiciones Generales en el Documento de Especificaciones; (4) según el testimonio

de Apelaciones, cuya sentencia confirmó la del foro primario.([5]) Apéndice, págs. 53–59. Luego acudió ante nosotros mediante un recurso de apelación, escrito que acogimos como una petición de *certiorari* y expedimos el auto solicitado.([6]) Dada la comparecencia de ambas partes, y hallándonos en posición de resolver, procedemos a hacerlo.

## II

■ Nuestro derecho de obligaciones y contratos gubernamentales parte de una premisa sencilla: las entidades gubernamentales están sujetas a las mismas normas que las demás personas y entidades. Véanse, *e.g.*: *Campos v. Cía. Fom. Ind.*, 153 D.P.R. 137, 149 (2001); *Mun. de Ponce v. Gobernador*, 136 D.P.R. 776, 787 (1994); *Plan Bienestar Salud v. Alcalde Cabo Rojo*, 114 D.P.R. 697, 699 (1983); *Zequeira v. CRUV*, 83 D.P.R. 878, 880–881 (1961); *Rodríguez v. Municipio*, 75 D.P.R. 479, 494 (1953). Evidentemente, esta norma admite múltiples excepciones, entre

---

del peticionario, Edgardo Lebrón, el arbitraje nunca se discutió con el Municipio y no surge de la prueba que las partes hayan negociado sobre ello; (5) el Documento de Especificaciones no estuvo ante las partes cuando se firmó el contrato de construcción; (6) el arquitecto Rigau no informó al Municipio sobre la cláusula de arbitraje; (7) el Documento de Especificaciones estaba en posesión del Departamento de Conservación, Ornato y Desarrollo Urbano del Municipio; (8) el costo de las cuatro fases sería $1 100 000, $918 265, $37 607 y $454 264. Al examinar estos hechos a la luz del derecho aplicable, el Tribunal de Primera Instancia concluyó que no hubo entre las partes un pacto de arbitraje. Destacó que las partes no discutieron ni negociaron sobre el asunto. Apéndice, págs. 54–55 y 58.

([5]) El Tribunal de Apelaciones prestó deferencia a la apreciación de la prueba que hizo el foro de instancia. Señaló, *inter alia*, que las partes no discutieron el arbitraje y que Rigau & Penabad incluyó las Condiciones Generales en el Documento de Especificaciones sin la autorización del Municipio. Apéndice, págs. 8–9.

"PRIMER ERROR: Erró el Honorable TA al requerir, como condición para la obligatoriedad de una disposición contractual, que ésta sea aprobada o autorizada

"TERCER ERROR: Erró el Honorable TA al avalar la determinación del TPI a los efectos de que el contrato de construcción no tiene en su texto, ni por referencia una cláusula de arbitraje.

"CUARTO ERROR: Erró el Honorable TA al entender que el Municipio de Mayagüez no está obligado por todas las disposiciones contenidas en el Pliego de Especificaciones que ese mismo municipio ordenó confeccionar y, posteriormente entregó a todos los licitadores de la subasta para que rigieran el proceso de subasta, contratación y ejecución de la obra subastada." Apelación civil, págs. 5–6.

ellas, que todo contrato con un municipio debe ser por escrito. Véase *Lugo v. Municipio Guayama*, 163 D.P.R. 208 (2004). No existen disposiciones jurídicas vigentes que impongan requisitos u otras normas especiales al pacto de arbitraje entre un municipio y un particular. Por ende, debemos examinar el derecho general con respecto a los acuerdos de arbitraje.

## III

■ Generalmente, nuestro ordenamiento permite que las partes en un contrato se obliguen al arbitraje de las posibles controversias relacionadas con su contrato. Dicha facultad surge principalmente de la Ley de Arbitraje Comercial (Ley de Arbitraje), la cual establece que las partes "podrán incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cualquier controversia que en el futuro surgiere entre ellos de dicho acuerdo o en relación con el mismo". 32 L.P.R.A. sec. 3201. Tales convenios, se dispone, serán válidos, exigibles e irrevocables "salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio". Art. 1 de la Ley Núm. 376 de 8 de mayo de 1951 (32 L.P.R.A. sec. 3201). De modo que estamos ante una figura de naturaleza contractual. *Rivera v. Samaritano & Co., Inc.*, 108 D.P.R. 604, 606–607 (1979); *U.C.P.R. v. Triangle Engineering Corp.*, 136 D.P.R. 133, 144 (1994).

■ El arbitraje convencional, naturalmente, es exigible sólo cuando se ha pactado, y el precepto citado de la Ley de Arbitraje aclara que dicho pacto debe ser por escrito. *Mun. de Ponce v. Gobernador*, supra, pág. 783; *Crufon Const. v. Aut. Edif. Púbs.*, 156 D.P.R. 197 (2002). Si existe controversia con respecto a la obligación de arbitrar, las partes tienen derecho a que se dirima en los tribunales. Art. 4 de la Ley de Arbitraje, 32 L.P.R.A. sec. 3204. Hemos señalado que tal controversia admite tres modalidades. Puede referirse a si existe un convenio de arbitraje, si tal

convenio alcanza determinada controversia y si tal convenio alcanza una disputa sobre la duración o expiración del contrato. *U.C.P.R. v. Triangle Engineering Corp.*, supra, pág. 144; *World Films, Inc. v. Paramount Pict. Corp.*, 125 D.P.R. 352, 361 esc. 9 (1990); *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756 (Cir. D.C. 1988).

Ahora bien, como existe una fuerte política pública favorable al arbitraje, toda duda con respecto a si procede debe resolverse en la afirmativa. *Paine Webber v. Soc. de Gananciales*, 151 D.P.R. 307, 312–313 (2000); *U.C.P.R. v. Triangle Engineering Corp.*, supra, págs. 141–143; *World Films, Inc. v. Paramount Pict. Corp.*, supra, págs. 361–362; *McGregor-Doniger v. Tribunal Superior*, 98 D.P.R. 864 (1970). Incluso, hemos señalado que "ante un convenio de arbitraje lo prudencial es la abstención judicial, aunque esa intervención no esté vedada". *U.C.P.R. v. Triangle Engineering Corp.*, supra, pág. 142. También hemos observado que según la Ley Federal de Arbitraje, 9 U.S.C.A. sec. 1 *et seq.*,[7] cuando existe un convenio válido y exigible de arbitraje, los tribunales carecen de discreción con respecto a su eficacia. *Paine Webber v. Soc. de Gananciales*, supra, págs. 311–312.

B. En el ámbito de los contratos de construcción comercial, las cláusulas de arbitraje no precisan un consentimiento específico, sino que pueden incorporarse mediante referencia en el contrato principal. Se ha entendido así en la mayoría de las jurisdicciones estadounidenses, a cuya jurisprudencia acudimos por ser nuestra Ley de Arbitraje una criatura del derecho norteamericano. Véanse, *e.g.: T.R. Mills Contractors, Inc. v. WRH Enterprises*, 93 S.W.3d 861, 870–871 (2002); *Liberty Mgmt. & Constr. v. Fifth Ave. & Sixty-Sixth St. Corp.*, 208 A.D.2d 73 (1995); *ADC Construction Co. v. McDaniel Grading, Inc.*, 338

---

(7) La Ley Federal de Arbitraje aplica a los contratos en el comercio interestatal. *Paine Webber v. Soc. de Gananciales*, 151 D.P.R. 307, 312–313 (2000).

S.E.2d 733 (1985). Incluso, la casuística de algunas jurisdicciones sugiere que la incorporación no exige palabras sacramentales ni la firma del documento incorporador, aun cuando el arbitraje precisa un acuerdo escrito.[8]

El caso *Liberty Mgmt. & Constr. v. Fifth Ave. & Sixty-Sixth St. Corp.*, supra, ilustra la norma aludida. En su propuesta de subasta, un contratista expresó que había examinado y entendía los planos, las especificaciones y las instrucciones en relación con un proyecto de remodelación. También expresó su voluntad *de realizar el trabajo en estricta conformidad con los documentos contractuales.* Éstos incluían un modelo contractual del AIA que incorporaba, a su vez, las Condiciones Generales de dicha entidad. El dueño de la obra aceptó una versión revisada de la propuesta, mediante una carta cursada el 18 de noviembre de 1991. Aunque el contratista no firmó los documentos del AIA, se alegó que los había aceptado mediante otra carta, cursada el 20 de diciembre de 1991. Resolvió el tribunal que era oponible al contratista la cláusula de arbitraje contenida en las Condiciones Generales:

> Thus, under either version of the agreement, plaintiff's — the agreement allegedly completed by appellant's December 16, 1991 letter accepting plaintiff's November 18, 1991 proposal, as subsequently revised —or appellant's— the December 20, 1991 AIA contract, which plaintiff allegedly accepted by its January 2, 1992 letter —plaintiff agreed to arbitrate. *Liberty Mgmt. & Constr. v. Fifth Ave. & Sixty-Sixth St. Corp.*, supra, pág. 78.[9]

---

[8] La jurisprudencia discutida a continuación se resume útilmente en W.J. Dunn, *Contract providing that it is governed by or subject to rules or regulations of a particular trade, business, or association as incorporating agreement to arbitrate*, 41 A.L.R. 2d 87, y en R.J. Sutton, *Enforcement of Arbitration Agreement Contained in Construction Contract by or Against Nonsignatory*, 100 A.L.R.5th 481.

[9] También, véanse: *T.R. Mills Contractors, Inc. v. WRH Enterprises*, 93 S.W.3d 861, 870–871 (2002); *Landmark Properties v. Architects Intern.*, 526 N.E.2d 603 (1988); *Todd Habermann Construction, Inc. v. Epstein*, 70 F. Supp.2d 1170 (D. Colo. 1999); *Frank J. Rodney, Inc. v. Charles W. Ackerman of Fla.*, 219 So.2d 110 (1969), *cert.* desestimado, 230 So.2d 13 (1969).

En otras industrias se ha aplicado un criterio similar.([10]) A pesar de que algunos tribunales han sido menos flexibles,([11]) la jurisprudencia citada es de gran valor persuasivo dada nuestra política pública favorable al arbitraje.

## IV

El norte de la interpretación contractual es determinar cuál fue la real y común intención de las partes. *Merle v. West Bend Co.*, 97 D.P.R. 403, 409–410 (1969); *Carrillo Norat v. Camejo*, 107 D.P.R. 132, 138 (1978); *Marcial v. Tomé*, 144 D.P.R. 522, 537 (1997); *Unisys v. Ramallo Brothers*, 128 D.P.R. 842, 852–853 (1991); *Ramírez, Segal & Látimer v. Rojo Rigual*, 123 D.P.R. 161, 173–174 (1989). Dicho análisis comienza y termina con los términos del contrato, siempre que éstos sean claros y no dejen duda alguna sobre la susodicha intención. Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471; *Trinidad v. Chade*, 153 D.P.R. 280, 289 (2001); *Marcial v. Tomé*, supra, pág. 536; *Soc. de Gananciales v. Vélez & Asoc.*, 145 D.P.R. 508, 517 (1998); *Unysis v. Ramallo Brothers*, supra, pág. 852. Así, hemos indicado que "la tendencia de los tribunales es a limitar la interpretación a los casos en que se haga verdaderamente necesaria", reconociendo, no obstante, que "[i]nterpretar si un contrato es claro presupone concordar su letra con la intención de las partes". *Marcial v. Tomé*, supra, pág. 537. Véase también, *e.g., Merle v. West Bend Co.*, supra, págs. 410–411.

---

([10]) Véase, por ejemplo, *Wilson & Co. v. Fremont Cake & Meal Co.*, 77 F. Supp. 364 (D. Neb. 1948).

([11]) *In re General Silk Importing Co.*, 189 N.Y.S. 391 (1921); *In Re General Silk Importing Co.*, 194 N.Y.S. 15 (1922), confirmado, 234 N.Y. 513; *Bachmann, Emmerich & Co. U.S.A. Wenger & Co.*, 197 N.Y.S. 879 (1923); *Riverdale Fabrics Corp. v. Tillinghast-Stiles Co.*, 306 N.Y. 288 (1954). Cf. *Level Export Corp. v. Wolz, Aiken & Co.*, 305 N.Y. 82 (1953); 121 N.Y.S.2d 261. Obsérvese que a veces se niega el arbitraje en el contexto de circunstancias especiales. Véase, *e.g.: Harper v. Ultimo*, 113 Cal. App. 4th 1402 (2003); *Western Vegetable Oils Co. v. Southern Cotton Oil Co.*, 141 F.2d 235 (9no Cir. 1944); *Pillsbury v. Blumenthal*, 272 P.2d 326 (N.M. 1954); *Northridge Cooperative Section No. 1 v. 32nd Avenue Construction Corp.*, 139 N.Y.S.2d 37 (1955); *American Rail & Steel Co. v. India Supply Mission*, 308 N.Y. 577 (1955).

■ Para determinar la verdadera y común intención de las partes, acudimos a una serie de normas interpretativas. Por un lado, es preciso examinar la evidencia extrínseca al contrato. Dicha evidencia ha de referirse, principalmente, a los actos de las partes coetáneos y posteriores al contrato. Art. 1234 del Código Civil, 31 L.P.R.A. sec. 3472. Ello no impide, sin embargo, que se examinen todas las circunstancias indicativas de la intención contractual, incluyendo la ocasión, las circunstancias, las personas y el acuerdo que se intentó llevar a cabo, así como los actos ocurridos durante la preparación del contrato. *Unysis v. Ramallo Brothers*, supra, pág. 853; *Ramírez, Segal & Látimer v. Rojo Rigual*, supra, pág. 174; *Merle v. West Bend Co.*, supra, pág. 410; *Coop. La Sagrada Familia v. Castillo*, 107 D.P.R. 405 (1978).

■ Por otro lado, varios principios encausan la interpretación de las palabras que se utilizaron para dar expresión al contrato. Son relevantes al caso de autos los Arts. 1239 y 1240 del Código Civil, 31 L.P.R.A. secs. 3477 y 3478. El primero establece que debemos utilizar el uso y la costumbre del lugar o industria pertinentes al contrato para aclarar lo pactado y para suplir lo no pactado. *G.H. Hammond Co. v. Diego Agüeros & Co.*, 30 D.P.R. 610 (1922); *Soc. de Gananciales v. Serrano*, 145 D.P.R. 394, 399 esc. 2 (1998); J. Puig Brutau, *Fundamentos de Derecho Civil*, 3ra ed., Madrid, Ed. Bosch, 1988, T. II, Vol. 1, pág. 237. Por otro lado, el citado Art. 1240 establece que la ambigüedad de un contrato o de sus cláusulas debe resolverse contra quien la provocó, aun cuando no se trata de un contrato de adhesión. Véanse, *e.g.*: *Coop. La Sagrada Familia v. Castillo*, supra, pág. 418; *Zequeira v. CRUV*, supra, pág. 880.

■ Cabe añadir que el principio de lealtad incide sobre la interpretación de los contratos. Es decir, cuando resulta necesario determinar cuál fue la común voluntad de los contratantes, se entiende que éstos quisieron expresarse como lo hubiera hecho una persona de buena fe. En *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61, 75

(1987), citamos a Luis Díez-Picazo, en su obra *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, Cap. XI, Sec. 45, págs. 251–252, quien explica esta norma:

> "[Los contratos] deben interpretarse de acuerdo con la buena fe ... [que es] un [*standard*] de conducta arreglada a los imperativos éticos exigibles de acuerdo con la conciencia social imperante .... Los contratos han de ser interpretados presuponiendo una lealtad y una corrección en su misma elaboración, es decir, entendiendo que las partes al redactarlos quisieron expresarse según el modo normal propio de gentes honestas y no buscando circunloquios, confusiones deliberadas u oscuridades .... El contrato debe ser interpretado de manera que el sentido que se le atribuya sea el más conforme para llegar a un desenvolvimiento leal de las relaciones contractuales y para llegar a las consecuencias contractuales exigidas conforme a las normas éticas. La buena fe impone también la aplicación de las ideas de confianza y autorresponsabilidad en la interpretación .... Las declaraciones de voluntad deben interpretarse en el sentido más conforme con la confianza que hayan podido suscitar de acuerdo con la buena fe." (Énfasis suprimido y corchetes suplidos y en el original.)

██ Véanse, también: *Ramírez, Segal & Látimer v. Rojo Rigual*, supra, págs. 174-175; L. Díez–Picazo y A. Gullón, *Sistema de Derecho Civil*, 6ta ed., Madrid, Ed. Tecnos, 1989, Vol. II, págs. 86–87. Cabe añadir que el principio de lealtad en la redacción contractual incluye un deber de diligencia, ya que se presume "una *corrección* en su misma elaboración" y una expresión "según *el modo normal* propio de gentes honestas".

██ Finalmente, la controversia de marras exige una aclaración con respecto al vínculo entre la interpretación contractual y las normas hermenéuticas reseñadas. Hemos reiterado que el norte de tal interpretación es la verdadera y común intención de las partes. Sin embargo, las normas hermenéuticas que establece el Código Civil —Arts. 1233–1241 (31 L.P.R.A. secs. 3471–3479)— "son auténticas normas jurídicas, no máximas de experiencia, y como tales obligan al intérprete (jueces, árbitros)". Díez-Picazo y Gu-

llón, *op. cit.*, pág. 88 (refiriéndose a los Arts. 1.281–1.289 del Código Civil español).

 Lo anterior significa, cuando menos, que si las normas interpretativas favorecen clara y consecuentemente una interpretación sobre otra, debe prevalecer la primera. Por ejemplo, la versión que surge claramente de los actos y las circunstancias pertinentes debe prevalecer sobre la que surge del testimonio de un contratante con respecto a su propia intención, y la interpretación derivada del principio de lealtad ha de vencer una con mayor apoyo en la evidencia, pero claramente contraria a éste. Si bien la hermenéutica contractual tiene su norte en la verdadera y común intención de las partes, los cánones interpretativos son el imprescindible compás judicial.

V

Hemos visto que los convenios de arbitraje con un municipio están sujetos al derecho general de las obligaciones y que un acuerdo de arbitraje es susceptible de incorporación por referencia en un contrato escrito. El caso de autos no presenta controversia alguna con respecto a la validez y eficacia del contrato de construcción entre el Municipio y Lebrón. Por ende, la única pregunta a dirimir es si dicho contrato incorporó, mediante referencia, el artículo sobre el arbitraje de las Condiciones Generales.

Delimitada así la pregunta, se observa que la única disposición pertinente del contrato establece que el Municipio contrata a Lebrón para que realice la remodelación "conforme se describe en los planos y especificaciones sometidos por el Departamento". Resolvemos que, en las circunstancias de este caso, dicha cláusula basta para incorporar el documento A201 y su Art. 7.9 de las Condiciones Generales, sobre arbitraje, Apéndice, pág. 107. Veamos.

A. El alcance de la disposición citada admite más de una interpretación. Por un lado, podría significar que las obras de remodelación habrían de realizarse según los pla-

nos y las especificaciones, es decir, según las disposiciones técnicas allí contenidas. Esta interpretación tiene el efecto de excluir toda referencia a las disposiciones no técnicas del Documento de Especificaciones, el cual contiene las Condiciones Generales.

Por otro lado, la disposición citada podría significar que el Municipio "contrata los servicios del [peticionario] ... conforme se describe en los planos y especificaciones sometidos por el Departamento"; es decir, que la frase "conforme se describe en los planos y especificaciones" modifica, no la descripción del trabajo, sino la descripción del contrato. Así interpretada, la cláusula hace referencia a todo el contenido del Documento de Especificaciones, incluso el documento A201 y el Art. 7.9 de las Condiciones Generales, *supra*, sobre arbitraje.

Ante estas dos posibles interpretaciones, debemos concluir que estamos ante una ambigüedad jurídica. Se recordará que la ambigüedad de un contrato no responde exclusivamente a sus palabras, sino que estamos obligados a "concordar su letra con la intención de las partes", máxime cuando existe una fuerte política pública en pro del arbitraje. Para ello acudimos al texto contractual y a la evidencia extrínseca, no sólo aquella relacionada con los actos de las partes coetáneos y posteriores al contrato, sino también la que se refiere a los actos en preparación del contrato y a la ocasión, circunstancias, personas y acuerdo que se intentó llevar a cabo.

Los hechos de este caso revelan una ambigüedad en la intención de las partes con respecto a la incorporación del Documento de Especificaciones. Durante los procesos de subasta, el Municipio indicó que dicho documento sería parte del contrato. Lebrón participó en estos procesos y recibió las especificaciones del Municipio. A pesar de que ambas subastas se declararon desiertas, las partes otorgaron el contrato de construcción unos meses después, mas sin antes discutir la cuestión del arbitraje. Dicho contrato hizo referencia al Documento de Especificaciones, referencia que no se limitó, expresamente, a los aspectos técnicos

del documento. Estas actuaciones revelan una ambigüedad con respecto a si ambas partes quisieron incorporar todo el contenido de las especificaciones.

De otra parte, la jurisprudencia estadounidense examinada sugiere que el documento A201 del AIA es común en la industria de diseño y construcción de dicho país. Luego veremos que el Tribunal de Primera Instancia hizo una apreciación análoga con respecto a la industria local. Las partes no son ajenas a dichas industrias, y el Municipio contó con la asistencia de su división legal. Además, el documento A201 advierte conspicuamente en su primera página: "this document has important legal consequences; consultation with an attorney is encouraged with respect to its modification." Apéndice, pág. 96.

Por lo tanto, confirman nuestra conclusión, como pasamos a discutir, la ocasión, las circunstancias, las personas y el acuerdo que se intentó llevar a cabo.

B. Habida cuenta de que resulta ambigua la referencia contractual a "los planos y especificaciones sometidos por el Departamento", resolvemos que el contrato de construcción hace referencia a todas las disposiciones del Documento de Especificaciones, documento que incluye las Condiciones Generales y su Art. 7.9 sobre arbitraje, *supra.*

Al menos cuatro consideraciones apoyan esta conclusión. En primer lugar, si existe alguna duda con respecto a la obligación de arbitrar, se debe reconocer dicha obligación. Segundo, la ambigüedad de un contrato o de sus cláusulas no debe favorecer a quien la provocó. Las partes estipularon en el *Informe sobre conferencia preliminar entre abogados* que Lebrón & Associates no intervino en la redacción del contrato de construcción, y el Municipio admite que lo redactó un funcionario suyo, a saber, el asesor legal a cargo de la unidad de contratos. Apéndice, pág. 764; Alegato del Municipio de Mayagüez, págs. 4–5 y 12–13; Exposición narrativa estipulada, Apéndice, pág. 984–986. Por ende, la ambigüedad de la cláusula de incorporación no debe favorecer al Municipio.

En tercer lugar, el uso y la costumbre sirven para especificar y suplir la ambigua intención de los contratantes. En las conclusiones de derecho de su Sentencia, el Tribunal de Primera Instancia expresó lo siguiente:

> No se manifiesta un convenio expreso ni oral; por el contrario, lo que surge es una inclusión de arbitraje conforme a *un procedimiento rutinario* al preparar los documentos de especificaciones requeridos por el contrato de diseño, planos y otros suscrito con la firma arquitectos Rigau & Penabad. (Énfasis suplido.) Apéndice, pág. 58.

Es decir, el foro sentenciador entiende que incluir el escrito A201 en el Documento de Especificaciones es algo rutinario en la industria local de diseño y construcción. Ello no significa que todo contrato de construcción se entendería pactado con el documento de uso rutinario. Pero cuando el contrato consta por escrito y hace referencia ambigua a un grupo de documentos, y éste contiene un escrito que a menudo se utiliza íntegramente en la industria pertinente, el uso y la costumbre favorecen la total incorporación contractual del escrito.

El principio de la buena fe conduce al mismo resultado. Al interpretar el contrato de construcción, suponemos " 'una lealtad y una corrección en su misma elaboración' ", lo cual significa que las partes " 'quisieron expresarse según el modo normal propio de gentes honestas y no buscando circunloquios, confusiones deliberadas u oscuridades …' ". (Énfasis suprimido.) *Negrón Rivera y Bonilla, Ex parte*, supra, pág. 75. Dado que el Municipio había incluido las Condiciones Generales en el Documento de Especificaciones, que el contrato de construcción hacía referencia a dicho documento, y que se trata de un negocio jurídico multimillonario, sólo una persona desleal hubiera tenido la intención de limitar su alcance sin expresarla tajantemente.

C. Los argumentos del Municipio no alteran el resultado que hemos alcanzado. Éste sostiene que no tuvo la

intención de obligarse al arbitraje.([12]) Su conclusión se ampara, principalmente, en dos hechos: primero, que el contrato de construcción se redactó con el propósito de incorporar sólo los aspectos técnicos del Documento de Especificaciones; segundo, que los funcionarios facultados para vincular al Municipio desconocían la existencia del Art. 7.9 de las Condiciones Generales, *supra*, sobre el arbitraje, ya que las Condiciones Generales se colocaron en el Documento de Especificaciones sin su autorización y conocimiento. Es decir, admite el recurrido que otorgó un contrato multimillonario sin examinar los documentos incorporados ni limitar cuidadosamente su incorporación.

La posición del Municipio con respecto a su intención al redactar el contrato está fundamentada en el testimonio del funcionario que lo redactó. Éste declaró que su propósito era incorporar los aspectos técnicos de las especificaciones y que el Municipio tenía una política pública contraria a las cláusulas de arbitraje. Exposición narrativa estipulada, Apéndice, págs. 984–986; Alegato del recurrido, págs. 12–13. No está claro si el foro sentenciador confirió entera credibilidad a dicho testigo, pero la cuestión es académica. Cuando los cánones de hermenéutica contractual favorecen clara y consecuentemente una interpretación sobre otra, debe prevalecer la primera. Dadas las circunstancias de este caso, el juzgador debió rechazar la posición del Municipio, aun cuando le mereciera entera credibilidad el testimonio del funcionario.

Añade el Municipio que los funcionarios facultados para vincularlo desconocían la existencia de la disposición sobre arbitraje. Ahora, el recurrido no niega que las Condiciones

---

([12]) El recurrido esgrime otros argumentos que no merecen un análisis detenido, dados los hechos de este caso y el derecho aplicable. Sostiene el Municipio, por ejemplo, que validar la disposición sobre arbitraje sería "inconsciente" (entiéndase, leonino). Añade que el pacto de arbitraje es contrario al orden público porque, entre otras cosas, las Condiciones Generales no se enviaron al Contralor, el asesor legal del Municipio nunca aprobó la cláusula de arbitraje, los arquitectos no tenían autorización para incluir el documento A201 en las especificaciones, y la American Arbitration Association es un foro costoso e inadecuado. Alegato, Apéndice, págs. 15–17 y 22–28.

Generales formaron parte del Documento de Especificaciones durante las dos subastas y durante la negociación del contrato de construcción. Nuestra inspección de los autos revela que el documento A201 se halla sin dificultad y que el contenido básico de su Art. 7.9, *supra*, resulta evidente tras una lectura superficial del escrito. Por ende, la posición del Municipio es —y sólo puede ser— que los funcionarios pertinentes no examinaron el Documento de Especificaciones antes de otorgar un multimillonario contrato de construcción.

Podríamos despachar este argumento con la famosa consigna del Juez Asociado Señor Serrano Geyls,[13] pero resulta innecesario. La negligencia de quien otorga un contrato no es óbice para que se interprete según la política pública en pro del arbitraje, el uso y la costumbre, la buena fe y la norma desfavorable a quien provoca una ambigüedad. De hecho, el principio de lealtad en la redacción contractual incluye un deber de diligencia. Así, la admisión del Municipio con respecto a su falta de conocimiento confirma nuestra conclusión.

## VI

En virtud de los fundamentos expuestos, se revoca la *sentencia* recurrida y, en consecuencia, se desestima la demanda de epígrafe.

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Fuster Berlingeri no intervino. El Juez Asociado Señor Rivera Pérez no interviene.

---

[13] "Los jueces no debemos ... ser tan inocentes como para creer declaraciones que nadie más creería." *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573, 582 (1961).