ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| **NEW CENTURY FINANCE CORP.**<br><br>Apelado<br><br>v.<br><br>**NORFE GROUP, INC., y otros**<br><br>Apelante | KLCE202500155 | ***CERTIORARI* acogido como Apelación**, procedente del Tribunal de Primera Instancia, Sala Superior de **San Juan**<br><br>Civil Núm.:<br>**SJ2019CV09211**<br><br>Sobre: Cobro de Dinero |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos.

Cintrón Cintrón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 9 de mayo de 2025.

Norfe Group, Corp. (Norfe Group o parte apelante), nos solicita que revoquemos la *Sentencia* emitida el 14 de enero de 2025, por el Tribunal de Primera Instancia (TPI), Sala Superior de San Juan. Mediante la misma, el TPI declaró *Ha Lugar* la solicitud de sentencia sumaria presentada por New Century Finance, Corp. (New Century o parte apelada) y desestimó la reconvención instada por la parte apelante.

Ahora bien, a pesar de que se instó un recurso de *certiorari*, lo acogemos como una apelación, toda vez que se recurre de una *Sentencia* emitida por el foro de instancia. Sin embargo, se mantendrá el mismo alfanumérico asignado por la Secretaría de este Tribunal de Apelaciones por cuestiones de economía procesal.

Por los fundamentos que expondremos a continuación, se confirma la *Sentencia* apelada.

## I.

Según surge del expediente, el 18 de julio de 2019, New Century incoó una *Demanda* sobre cobro de dinero contra Norfe Group y el señor David E. Efron. Alegó que, en el 2018, suscribió junto a la parte demandada el contrato de financiamiento número 01064011747 para financiar la prima de la póliza de seguro número CP-54951 por la cantidad total de $165,552.00, incluyendo los cargos por financiamiento. Añadió que, tras efectuar un pronto pago de $32,512.00, Norfe Group acordó financiar el balance de $133,040.00, mediante un pago mensual de $13,304.00 en 10 pagos mensuales, comenzando el 10 de enero de 2018 y culminando el 10 de octubre de 2018. Adujo que, vencido el término acordado para el pago de la cantidad financiada, Norfe Group le adeudaba un balance de $800.86. Precisó que reclamó extrajudicialmente el referido pago, sin éxito. Arguyó que Norfe Group y el Sr. Efron le respondían solidariamente por los hechos alegados en la demanda, según lo establecido en el contrato de financiamiento. Por todo lo anterior, solicitó al TPI que: (1) declarara *ha lugar* la demanda y ordenara a la Norfe Group y el señor Efron pagarle la suma principal de $800.86, los intereses acumulados al tipo legal prevaleciente, más una cantidad de $200.22, por concepto de costas, gastos y honorarios de abogado.

El 7 de octubre de 2019, Norfe Group instó una *Reconvención.* Alegó que New Century extendió financiamiento sobre una póliza de seguro de riesgo de propiedades comerciales y cobró un depósito de $32,512.00 como *down payment.* Esbozó que, aunque se realizaban los pagos mensuales de $13,304.00, la aseguradora QBE Seguros canceló la póliza sin razón alguna. Aseveró que realizó continuas gestiones extrajudiciales dirigidas a que New Century le reembolsara el depósito inicial de $32,512.00, que, a su entender, no se usó y se cobró, y nunca fue devuelto tras la cancelación de la póliza. Esgrimió que las gestiones fueron infructuosas, por lo que requirió al foro *a*

*quo* que declarara No Ha Lugar la demanda y diera paso a la reconvención.

New Century contestó la *Reconvención* oportunamente. Razonó que Norfe Group solo realizó los primeros cuatro (4) pagos mensuales, realizando los últimos tres (3) pagos fuera del término establecido de 10 días de cada mes y por los cuales no le aplicó el cargo por demora establecido en el contrato de financiamiento. Añadió que, el 13 de junio de 2018, luego de que Norfe Group incumpliera el acuerdo de pago firmado, al no emitir los pagos correspondientes a los meses de mayo y junio, procedió a cancelar la póliza expedida por falta de pago. A su vez, expuso que, el 25 de junio de 2018, devolvió la prima por cancelación, dejando el balance reclamado en la demanda de $800.86. Sostuvo que la reconvención era frívola y que Norfe Group actuó con temeridad.

Tras múltiples incidentes procesales, el 17 de agosto de 2022, New Century incoó una *Solicitud de Sentencia Sumaria,* en la cual expuso 33 hechos pertinentes que, a su consideración, no estaban en controversia. Esencialmente, arguyó que no existían asuntos litigiosos en controversia que impidieran al TPI disponer sumariamente del caso. Argumentó que procedía el pago de la suma de $800.86, más los intereses aplicables y gastos de honorarios de abogados. Además, reiteró que la *Reconvención* era inmeritoria.[1]

Por su parte, el 6 de septiembre de 2022, Norfe Group presentó una *Oposición a Solicitud de Sentencia Sumaria,* en la cual incluyó 6 hechos sobre los cuales entendía que no había controversia.[2] Arguyó que la solicitud de sentencia sumaria atentaba contra los principios de buena fe y reflejaba la

---

[1] Junto a su solicitud anejó los siguientes documentos: Contrato de Financiamiento; Póliza QBE Seguros CP 54951; varios cheques y recibos de pago; Aviso de Cancelación de QBE Seguros; Declaración Jurada de Suicela Corsino, gerente de New Century; varias cartas de cobro y parte de una deposición de Manuel Font Oronoz del 25 de mayo de 2022. Apéndice del recurso, págs. 124-329.

[2] Junto a su oposición anejó los siguientes documentos: *Aviso de Deposición Duces Tecum*; Webpage Grupo Optima; Comunicación Parte Demandada y varios endosos de póliza. Apéndice del recurso, págs. 331-362.

inconsistencia de New Century con sus propias alegaciones y actuaciones. Por ende, solicitó que fuera declarada No Ha Lugar por el Tribunal. Además, argumentó que New Century no logró establecer que la cancelación de la póliza fue realizada a solicitud de la compañía aseguradora QBE, y así justificar su cobro ilegal de la fianza prestada. Particularizó que la evidencia documental en el expediente del caso reflejaba un proceso similar a una cancelación a solicitud del asegurado, o su representante. Alegó que New Century pretendía retener ilegalmente el depósito de una póliza de seguros pagada en su totalidad, y que fuera cancelada por motivos fuera de su control.

El 14 de enero de 2025, el TPI dictó la *Sentencia* apelada. Según adelantado, declaró *Ha Lugar* la solicitud de sentencia sumaria presentada por New Century y desestimó la reconvención instada por Norfe Group. En su dictamen, el foro de instancia realizó las siguientes determinaciones de hechos:[3]

1. El 9 de diciembre de 2018, Norfe Group suscribió un Contrato de Venta al por menor a plazos con New Century, para el financiamiento de la prima de la póliza núm. CP-54951 otorgada por QBE Seguros.

2. Los términos y condiciones del Contrato de financiamiento, y el detalle de la cantidad financiada fueron los siguientes:

   a. Total de la prima: $161,964.00
   b. Pronto pagado por Norfe: $32,512.00
   d. Cargos por financiamiento: $3,588.00
   e. Total a pagar en plazos: $133,040.00[2]

3. Conforme a los términos y condiciones del Contrato de financiamiento, Norfe acordó realizar diez (10) pagos de $13,304.00, comenzando el 10 de enero de 2018 y terminando el 10 de octubre de 2018, para un total de $133,040.00.

4. La prima total por pagarse era de $165,552.00, la cual incluye el pronto de $32,512.00 pagado por Norfe.

5. El Contrato de Financiamiento, respecto al monto financiado dispone lo siguiente:

---

[3] Notas al calce suprimidas.

PAGARÉ Por valor recibido, y como causa del financiamiento concedido por NEW CENTURY FINANCE, CORP para la compra de la(s) póliza(s) antes mencionada(s) el Comprador se obliga a pagar a NEW CENTURY FINANCE, CORP la cantidad de $133,040.00 en pagos mensuales según el detalle antes mencionados, el cual forma parte del contrato de venta al por menor a plazos y está sujeto a todas las condiciones del mismo.

6. Conforme a los términos y condiciones del Contrato de Financiamiento, Norfe Group acordó ceder como garantía del cumplimiento de su obligación la póliza CP-54951.

7. El productor o bróker de Norfe Group, por medio del cual solicitó y aceptó la póliza núm. CP-54951, lo es Font Insurance. Así lo dispone el Contrato de financiamiento al indicar: Vendedor (Productor): 484/Font Insurance.

8. Según surge del Contrato de Financiamiento, la Agencia General de QBE Seguros es Colonial Insurance.

9. Mediante la firma del Contrato de Financiamiento, Norfe Group reconoció que el pago de la prima financiada se efectuó directamente a QBE Seguros a través de la Agencia General, Colonial. Así lo dispone expresamente los términos y condiciones del Contrato de Financiamiento:
   El Comprador (Asegurado) acepta que el pago de la(s) prima(s) de la(s) póliza(s) relacionada(s) con este Contrato se efectuará directamente a la(s) Compañía(s) de Seguro que abajo se indica(n) a través de su Agente General que suscribe.

10. Mediante la firma del Contrato de Financiamiento, Norfe Group asignó irrevocablemente a New Century como representante, para que, en nombre y en representación de Norfe Group, efectuara los siguientes actos:
    (a) requiera de la(s) compañía(s) cancelación de la(s) póliza(s) objeto de este financiamiento cuando el Comprador (Asegurado) no efectúe el pago correspondiente, luego de (15) días de vencido el plazo; endose a nombre del deudor cualquier cheque, giro, letra de cambio u orden de pago pagadero a su nombre y librado por la(s) compañía(s) aseguradora(s) como resultado de la cancelación de pólizas cuyas primas hayan sido financiadas total o parcialmente bajo el presente contrato hasta cubrir la cantidad adeudada; devolviendo al comprador cualquier remanente. Todo ello según lo dispuesto en el Art. 209(1) de la Ley Núm. 68.

11. Mediante la firma del Contrato de Financiamiento, Norfe Group expresamente autorizó a NCF a utilizar, en garantía de pago de las sumas acordadas en el Contrato de Financiamiento, el importe total de las primas no devengadas hasta el pago total del

balance adeudado, devolviendo a Norfe cualquier remanente de dichas primas:

El Comprador (Asegurado) expresamente autoriza y ordena a NCF y/o sus cesionarios en garantía el pago de las sumas adeudadas bajo este contrato el derecho a recibir el importe total de cualquier prima no devengada que deba devolverse al comprador (Asegurado) por razón de la cancelación de póliza(s) u otros motivos; y a estos efectos, el Comprador (Asegurado) autoriza y ordena a las compañía(s) aseguradoras a pagar a NCF o sus cesionarios, el importe total de las primas no devengadas que deba devolverse conforme a lo antes dispuesto mediante cheque pagadero a la orden de NCF, solamente, o sus cesionarios, según fuera el caso. Todo ello según lo dispuesto en el Art. 209(1) de la Ley Núm. 68.

12. Mediante la firma del Contrato de Financiamiento, NORFE reconoció y aceptó que cualquier cheque recibido por NCF, de conformidad con las cláusulas citadas en los Hechos # 10 y 11, sería aplicado, en primer lugar, a los cargos por financiamiento, cargos por demora adeudados y el remanente al principal adeudado a NCF al recibo del cheque en cuestión:

El Comprador (Asegurado) acepta y reconoce que el importe de cualquier cheque recibido por NCF, o sus cesionarios, en conformidad a lo dispuesto en las cláusulas anteriores, será aplicado, en primer término, a los cargos por financiamiento, cargos por demora adeudados y el remanente al principal adeudado por el Comprador bajo el presente contrato.

13. Mediante la firma del Contrato de Financiamiento, Norfe se obligó a pagarle a NCF las costas, gastos, intereses, y una cantidad líquida de 25% de la deuda como Honorarios de Abogados, en caso de que NCF tenga que reclamar judicialmente algún balance pendiente: El Comprador (Asegurado) renuncia a todo derecho de presentación, requerimiento y aviso. En caso de reclamación judicial de cualquier cantidad adeudada bajo este contrato, el Comprador se obliga a pagar a NCF, las costas, gastos, intereses, y una cuantía líquida de veinte y cinco (25) por ciento de la deuda como Honorarios de Abogados, con la mera radicación de la demanda, aun cuando los procedimientos se lleven en rebeldía.

14. Norfe se obligó a pagar inmediatamente cualquier balance que quedara pendiente luego de aplicarse el importe de las primas no devengadas:

El Comprador (Asegurado) se obliga a pagar inmediatamente cualquier balance quede pendiente de pago luego de aplicarse el importe de las primas no devengadas, conforme a lo antes dispuesto. Luego de satisfacer la totalidad adeudada por el Comprador bajo el presente contrato, será enviada a éste a su última dirección.

15. El 12 de diciembre de 2017, Golden RE LLC le otorga el cheque número 000183 de $32,512.00 en

concepto del pago del pronto del Contrato de Financiamiento a Font Insurance, Inc.

16. El 14 de diciembre de 2017, Font Insurance, productor de Norfe, otorga el cheque número 4536 de $32,512.00 en concepto del pago del pronto del Contrato de Financiamiento a favor de Colonial Insurance.

17. El 21 de diciembre de 2017, el pronto de $32,512.00 es pagado a QBE Seguros.

18. El 3 de enero de 2018, Norfe, a través de Golden RE LLC, otorga un cheque a favor de NCF por la cantidad de $13,304.00 en concepto del primer pago del Contrato de Financiamiento.

19. El 22 de febrero de 2018, Norfe, otorgó un cheque a favor de NCF por la cantidad de $13,304.00 en concepto del segundo pago del Contrato de Financiamiento.

20. El 23 de marzo de 2018, Norfe Group, otorgó un cheque a favor de NCF por la cantidad de $13,304.00 en concepto del tercer pago del Contrato de Financiamiento.

21. El 20 de abril de 2018, Norfe, a través de Golden RE LLC, otorgó un cheque a favor de NCF por la cantidad de $13,304.00 en concepto del cuarto pago del Contrato de Financiamiento.

22. El 17 de mayo de 2018, QBE procedió a solicitar la cancelación de la Póliza núm. CP-54951 otorgada por QBE Seguros, efectiva el 16 de junio de 2018.

23. El Aviso de Cancelación indica que:
QBE-SEGUROS Por este medio cancela la póliza o fianza arriba indicada y certificado de renovación si lo hubiera. Esta cancelación es efectiva en la fecha arriba mencionada a la misma hora del día que fue efectiva la póliza. El exceso de prima pagada sobre la prima devengada (si no se acompaña) será devuelta dentro de 15 días si así lo solicita el asegurado nombrado, de lo contrario dentro de 90 días a partir de la fecha de efectividad de la cancelación, pero el pago u ofrecimiento de la prima no es condición para la cancelación.

24. El aviso de cancelación de la [póliza] indicaba que el total de la prima no devengada a pagarse es por la cantidad de $78,067.00.

25. Al momento de la notificación de la cancelación, Norfe había realizado cuatro (4) pagos de $13,304.00 para un total de $53,216.00.

26. El balance adeudado a la fecha de cancelación, 16 de junio de 2018, era de $79,165.13.

27. Conforme a los términos y condiciones del Contrato de Financiamiento, a la cantidad adeudada a la

fecha de cancelación ($79,165.13), NCF le aplicó la devolución de la prima no devengada ($78,067.00), lo que equivale a una deuda de $1,098.13.

28. El 3 de octubre de 2018, NCF le notificó una misiva a Norfe solicitando el pago del balance de $1,098.13 dentro de un término de 10 días.

29. El 1 de febrero de 2019, NCF le notificó otra misiva a Norfe solicitando el pago de la suma de $1,098.13 en un término de siete (7) días.

30. A dicha deuda se le aplicó un crédito de $297.27, lo que supone una deuda líquida y exigible de $800.86.

31. El Sr. Manuel Font, productor de Norfe Group, quien adquirió la póliza en controversia, aceptó bajo juramento que Norfe Group adeuda la cantidad de $800.86.

Así las cosas, el TPI concluyó que:

En el contrato de financiamiento, Norfe Group acordó ceder como garantía del cumplimiento de su obligación la póliza CP-54951. Asimismo, asignó irrevocablemente a New Century como representante para que en su nombre y representación pudiera realizar varios actos, entre los que se incluía solicitar la cancelación de la póliza si el asegurado no efectuaba el pago correspondiente. Además, autorizó a New Century a utilizar las primas no devengadas como garantía de pago de las sumas acordadas en el contrato, hasta el pago total del balance adeudado, devolviendo a Norfe cualquier remanente. Del mismo modo, Norfe Group reconoció y aceptó que cualquier cheque recibido por New Century, conforme a las cláusulas relacionadas a la cancelación de la póliza y las primas no devengadas, se aplicaría en primera instancia a los cargos por financiamiento, cargos por demora y el remanente al principal adeudado a New Century.

En el caso que nos ocupa, el pronto por la cantidad de $32,512.00 fue pagado el 21 de diciembre de 2017 a QBE Seguros. Posteriormente, Norfe Group realizó cuatro pagos mensuales por la cantidad de $13,304.00 a New Century. Del expediente de autos surge que el 17 de mayo de 2018, QBE Seguros solicitó la cancelación de la póliza núm. CP-54951, la cual se hizo efectiva el 16 de junio de 2018. El aviso de cancelación de la póliza especificaba que el total de la prima no devengada era de $78,067.00 que sería pagada a New Century. El balance adeudado a la fecha de la cancelación era de $79,165.13. New Century aplicó el total de la prima no devengada ($78,067.00) al balance adeudado a la fecha de la cancelación, conforme a los términos y condiciones del Contrato de Financiamiento.

Luego de aplicar el total de la prima no devengada al balance adeudado, quedó un balance pendiente de $1,098.13, al cual se le aplicó un crédito de $297.27, quedando pendiente de saldo $800.86. New Century realizó gestiones de cobro a los fines de resolver el

balance adeudado, sin embargo, no logró resolver la deuda. Cabe destacar que el Sr. Manuel Font, productor de Norfe Group quien adquirió la póliza del caso de autos, aceptó bajo juramento que Norfe Group adeuda la cantidad de $800.86.

Además, determinó que en el caso de autos la cuantía reclamada era cierta y determinada. Por tanto, expresó que la cantidad reclamada de $800.86 era líquida, estaba vencida y era exigible.

Con respecto a la reconvención de Norfe Group, expresó que la cantidad de $32,512.00 fue pagada directamente a QBE Seguros, por lo que dicho pronto y/o depósito no estaba en posesión de New Century. Así, dispuso que el total de las primas no devengadas fue de $78,067.00, cantidad que QBE Seguros devolvió a New Century.

Por último, estableció que:

En el caso de autos, quien solicitó la cancelación de la póliza fue la aseguradora QBE Seguros, con lo cual, al ser cancelación y no recisión, QBE Seguros devolvió las primas no devengadas a la compañía que financió la póliza. Posteriormente, esas primas fueron aplicadas por New Century conforme a los términos del contrato de financiamiento, lo que resultó en el balance pendiente que se reclama. Es forzoso concluir que la reclamación de $32,512.00 contra New Century Corp. es improcedente.

En consonancia con lo anterior, el foro *a quo* ordenó a Norfe Group pagarle a New Century la suma adeudada de $800.86, más intereses, así como el 25% de la deuda líquida por concepto de honorarios de abogados, conforme establecido en el contrato de financiamiento.

Inconforme, Norfe Group acude ante este Tribunal de Apelaciones y alega que el TPI erró al emitir una sentencia tomando alegaciones y prueba inadmisible como ciertas sin evidencia que las respalde.

El 20 de marzo de 2025, New Century presentó su alegato, por lo que, con el beneficio de la comparecencia de todas las partes, procedemos a resolver.

## II.

### A.

La Regla 36 de Procedimiento Civil dispone el mecanismo extraordinario y discrecional de la sentencia sumaria. 32 LPRA, Ap. V, R. 36. El propósito principal de este mecanismo procesal es propiciar la solución justa, rápida y económica de litigios civiles que no presentan controversias genuinas de hechos materiales, por lo que puede prescindirse del juicio plenario. *Banco Popular de Puerto Rico v. Cable Media of Puerto Rico, Inc. y otro*, res. el 7 de enero de 2025, 2025 TSPR 1; *Serrano Picón v. Multinational Life Ins*, 212 DPR 981 (2023).[4] Los tribunales pueden dictar sentencia sumaria respecto a una parte de una reclamación o sobre la totalidad de esta. 32 LPRA Ap. V, R. 36.1; *Meléndez González v. M. Cuebas*, 193 DPR 100 (2015). La sentencia sumaria procederá si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, junto a cualquier declaración jurada que se presente, si alguna, demuestran que no hay controversia real y sustancial sobre algún hecho esencial y pertinente y que, como cuestión de derecho, procede hacerlo. *González Meléndez v. Mun. San Juan et al.,* 212 DPR 601 (2023).

El promovente debe presentar una moción fundamentada en declaraciones juradas o en cualquier evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes sobre la totalidad o parte de la reclamación. 32 LPRA Ap. V, R. 36.1; *Universal Ins. y otro v. ELA y otros*, 211 DPR 455 (2023). La controversia sobre los hechos esenciales que genera el litigio tiene que ser real, no especulativa o abstracta. Es decir, tiene que ser de naturaleza tal que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y

---

[4] Véase, además: *Oriental Bank v. Caballero García,* 212 DPR 671 (2023); *Ferrer et. al. v. PRTC*, 209 DPR 574, 580-581 (2022); *González Santiago v. Baxter Healthcare,* 202 DPR 281, 290 (2019); *Ramos Pérez v. Univisión*, 178 DPR 200, 213-214 (2010).

pertinentes. *Ramos Pérez v. Univisión*, supra, págs. 213-214, seguido en *Meléndez González v. M. Cuebas*, supra, pág. 110.

Nuestro ordenamiento civil y su jurisprudencia interpretativa dispone que se deben cumplir unos requisitos de forma los cuales deben satisfacerse al momento de presentar una solicitud de sentencia sumaria. Estos requisitos son: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria, (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del Tribunal; (5) las razones por las cuales se debe dictar sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V, R. 36.3; *Pérez Vargas v. Office Depot*, 203 DPR 687 (2019).

Por su parte, le corresponde a la parte promovida refutar dicha moción a través de declaraciones juradas u otra documentación que apoye su posición. Esto es, la parte que se opone debe proveer evidencia sustancial de los hechos materiales que están en disputa. *León Torres v. Rivera Lebrón*, 204 DPR 20 (2020). El hecho de no oponerse a la solicitud de sentencia sumaria no implica necesariamente que ésta proceda si existe una controversia legítima sobre un hecho material. Sin embargo, el demandante no puede descansar en las aseveraciones generales de su demanda, "sino que, a tenor con la Regla 36.5, estará obligada a 'demostrar que [tiene] prueba para sustanciar sus alegaciones'". La Regla 36.5 de Procedimiento Civil, dispone que de no producirse por parte del opositor una exposición de hechos

materiales bajo juramento, deberá dictarse sentencia sumaria en su contra. 32 LPRA Ap. V, R. 36.5; *Ramos Pérez v. Univisión*, supra, págs. 215-216.

La Regla 36.4 de Procedimiento Civil, establece que, si no se dicta sentencia sobre la totalidad del pleito, ni se concede todo el remedio solicitado o se deniega la moción de sentencia sumaria, y, por tanto, es necesario celebrar juicio, será obligatorio que el Tribunal en su dictamen determine los hechos esenciales sobre los cuales no haya controversia sustancial y aquellos que sí se encuentran genuinamente en controversia. 32 LPRA Ap. V, R.36.4

Cónsono con lo anterior, nuestro estado de derecho le impone y exige al TPI, exponer los hechos materiales y esenciales que están en controversia, así como los que no lo están, independientemente de cómo resuelvan una solicitud de sentencia sumaria. *Meléndez González v. M. Cuebas*, supra, pág. 117. Al evaluar la solicitud de sentencia sumaria, el juzgador deberá: (1) analizar los documentos que acompañan la moción solicitando la sentencia sumaria, los incluidos con la moción en oposición y aquellos que obren en el expediente judicial y; (2) determinar si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 913-914 (1994).

Por último, en *Meléndez González v. M. Cuebas,* supra, el Tribunal Supremo de Puerto Rico estableció el estándar de revisión que debe utilizar este foro apelativo intermedio al revisar denegatorias o concesiones de mociones de sentencia sumaria. Conforme a ello, debemos utilizar los mismos criterios que los tribunales de primera instancia al determinar si procede dictar sumariamente una sentencia. En esta tarea sólo podemos considerar los documentos que se presentaron ante el foro de

primera instancia y determinar si existe o no alguna controversia genuina de hechos pertinentes y esenciales, y si el derecho se aplicó de forma correcta. La tarea de adjudicar los hechos relevantes y esenciales en disputa le corresponde únicamente al foro de primera instancia en el ejercicio de su sana discreción. *Vera v. Dr. Bravo*, 161 DPR 308, 334 (2004). Nuestro Más Alto Foro ha pautado que este Tribunal de Apelaciones se encuentra en la misma posición que el Tribunal de Primera Instancia al momento de revisar solicitudes de sentencia sumaria. *Meléndez González v. M. Cuebas*, supra, págs. 118-119. Es decir, debemos revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho a la controversia. *Íd.*

**B.**

Conforme al Art. 1042 del Código Civil de Puerto Rico de 1930,[5] 31 LPRA sec. 2992, "[l]as obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitas o en que intervenga cualquier género de culpa o negligencia". Nuestro derecho de obligaciones preceptúa el principio de la libertad en la contratación. Conforme a este, las partes contratantes podrán establecer los pactos, cláusulas y condiciones que estimen convenientes, siempre que estos no sean contrarias a las leyes, la moral y al orden público. Art. 1207 del Código Civil de 1930, 31 LPRA sec. 3372.

Es norma establecida que para que un contrato sea válido es necesario que concurran los siguientes requisitos: consentimiento, objeto y causa. *Quest Diagnostics v. Mun. San Juan*, 175 DPR 994 (2009). Asimismo, en nuestro ordenamiento jurídico rige la teoría contractual de la libertad de contratación o la autonomía de la voluntad. Una vez perfeccionado el contrato por la concurrencia de los factores mencionados, las partes quedan obligadas, no solo al cumplimiento de lo expresamente pactado, sino también a todas las

---

[5] Vigente a la fecha de la causa de acción ante nuestra consideración.

consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil de 1930, 31 LPRA sec. 3375. Así, el incumplimiento contractual es definido como "el quebrantamiento de un deber que surge de un contrato expreso o implícito". De esta acción producir daños a una de las partes contratantes, surge una causa de acción. *Sociedad Legal de Gananciales v. Vélez & Asoc.*, 145 DPR 508, 521 (1998).

Sabido es que las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y estos deben ser cumplidos a tenor con las mismas. Art. 1044 del Código Civil, 31 LPRA sec. 2994. En consideración a dicho postulado, "cuando las personas contratan crean normas obligatorias; tan obligatorias como la ley misma", por lo que "los contratos... tienen fuerza de obligar; tienen que ser cumplidos...". *VDE Corporation v. F&R Contractors*, 180 DPR 21, 34 (2010), citando a J.R. Vélez Torres, *Curso de Derecho Civil*, San Juan, Ed. Universidad Interamericana de Puerto Rico, 2006, T. IV, Vol. II, págs. 99-100.

A tenor con lo anterior, el Art. 1233 del Código Civil, 31 LPRA sec. 3471 estipula que, si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. En cambio, si las palabras parecieran contrarias a la intención evidente de las partes, esta última prevalecerá sobre las palabras. *Íd.* De modo que la intención de los contratantes es el criterio fundamental para fijar el alcance de las obligaciones contractuales. *Marcial Burgos v. Tome*, 144 DPR 522, 537 (1997). Por ello, el norte de la interpretación contractual es determinar cuál fue la intención real y común de las partes. *Municipio Mayagüez v. Lebrón*, 167 DPR 713, 723 (2006).

Para auscultar dicha intención, los tribunales han aplicado una metodología pragmática que consiste en estudiar los actos anteriores, coetáneos y posteriores al momento de perfeccionarse el

contrato, incluyendo otras circunstancias que puedan denotar o indicar la verdadera voluntad de los contratantes y el acuerdo que intentaron llevar a cabo. *VDE Corporation v. F&R Contractors*, supra, págs. 34-35.

**III.**

En su escrito, la parte apelante alega que en el caso de autos procedía celebrarse un juicio, por entender que no existe una clara certeza sobre todos los hechos materiales. Sostiene que el TPI erró al conceder la solicitud de sentencia sumaria concernida.

Enfocada en el hecho de la cancelación de la póliza, la parte apelante esboza que autorizó expresamente a la parte apelada para recibir, en garantía al pago de las sumas adeudadas bajo el contrato, cualquier importe total de primas no devengadas a devolverse por razón de la cancelación de la póliza, y otros motivos, restituyendo al comprador cualquier remanente sobre la transacción. También autorizaba a la parte apelada a tramitar la cancelación de la póliza cuando el asegurado no efectuara el pago correspondiente luego de 15 días de vencido el plazo. Así, precisa que, en la presente causa, la parte apelada carecía de autoridad para cancelar la póliza o para realizar cualquier trámite relacionado porque el plazo de 15 días no se cumplió.

Además, es su contención que nunca se presentó evidencia de qué llevó a la parte apelada o a QBE Seguros a cancelar la póliza y que en efecto la parte apelada recibió la cantidad de $78,067.00 por parte de QBE Seguros, ni prueba de que ésta fue utilizada a su favor. En ese sentido, asegura que es víctima de una cancelación de póliza inesperada, razón por lo cual no es posible acreditar el cumplimiento con los términos para la mencionada cancelación que generen una deuda exigible por la parte apelada. En suma, reitera que la parte apelada pretende retener ilegalmente el depósito de una póliza de seguros que fue cancelada sin motivos.

Por otro lado, la parte apelada está conforme con la *Sentencia* bajo nuestra consideración. Hace hincapié en que QBE Seguros fue quien solicitó la cancelación de la póliza en cuestión y sostiene que existe prueba documental en el expediente que lo confirma, específicamente, el *Aviso de Cancelación* y una comunicación de la Gerente de New Century. Asegura que el expediente también contiene prueba sobre que recibió la cantidad de $78,067.00 en concepto de prima devengada de QBE Seguros y que ésta fue utilizada a favor de la parte apelante.

Asimismo, la parte apelada aduce que la reconvención instada en su contra carecía de méritos.

Por tratarse de una sentencia sumaria, este Tribunal debe evaluar *de novo* las solicitudes a favor y en contra de tal proceder, en unión a la documentación que surge del expediente. Luego de un ponderado análisis del expediente, así como de la normativa aplicable, concluimos que el error señalado por la parte apelante no se cometió. Por tanto, no incidió, ni abusó de su discreción el TPI al conceder el remedio sumario en cuestión. Tampoco erró al desestimar la reconvención incoada por la parte apelante.

Del récord se desprende que la parte apelada anejó a su solicitud de sentencia sumaria suficiente evidencia documental para probar cada una de sus alegaciones. Por ende, somos del parecer que estableció su derecho con claridad y demostró que no existían hechos materiales controvertidos que imposibilitaran que el TPI concediera su reclamo de forma sumaria y al mismo tiempo desestimara la reconvención incoada en su contra.

Según expuesto, las partes suscribieron un acuerdo de venta al por menor a plazos para el financiamiento de la prima de la póliza núm. CP-54951 otorgada por QBE Seguros. Asimismo, pactaron que la parte apelante realizaría 10 pagos de $13,304.00 comenzando el 10 de enero de 2018 y finalizando el 10 de octubre de 2018, para un

total de $133,040.00. El total de la prima a pagarse incluyendo el pronto pagado por la parte apelante ascendió a $165,552.00.

En el contrato de financiamiento, la parte apelante concertó ceder como garantía del cumplimiento de su obligación la póliza CP-54951. Además, estableció a la parte apelada como su representante para realizar varios actos, como, por ejemplo, solicitar la cancelación de la póliza si el asegurado no efectuaba el pago correspondiente. Más importante aun, la parte apelante facultó a la parte apelada a utilizar las primas no devengadas como garantía de pago de las sumas acordadas en el contrato, hasta el pago total del balance adeudado, devolviendo al primero cualquier remanente. También la parte apelante consintió a que cualquier cheque recibido por la parte apelada, conforme a las cláusulas aplicables del contrato, se aplicaría en primera instancia a los cargos por financiamiento, cargos por demora y el remanente al principal adeudado a la parte apelada.

El expediente es claro en evidenciar que la suma de $32,512.00 fue pagada a QBE Seguros, por lo que no está en posesión de la parte apelada. Al QBE Seguros cancelar la póliza le devolvió las primas no devengadas ($78,067.00) a la parte apelada, compañía que la financió. El balance adeudado a la fecha de la cancelación era de $79,165.13. La parte apelada aplicó el total de la prima no devengada al balance adeudado a la fecha de la cancelación, conforme a los términos del contrato de financiamiento concernido y quedó un balance pendiente de $1,098.13. A este último se le aplicó un crédito de $297.27.

En conclusión, forzoso es concluir que quedó pendiente un balance de $800.86 a favor de la parte apelada, según fueron reclamados en la demanda. De otro lado, es claro que la reclamación de $32,512.00 contra la parte apelada no procede.

## IV.

Por los fundamentos que anteceden, se confirma la *Sentencia* impugnada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.


                                        Lcda. Lilia M. Oquendo Solís
                            Secretaria del Tribunal de Apelaciones