ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| PHILLIP RUIZ LUGO<br><br>Apelado<br><br>V.<br><br>RIGOBERTO MATEO PÉREZ<br><br>Apelante | TA2025AP00495 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2023CV08315<br><br>Sobre: Incumplimiento de Contrato |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Rivera Torres y el Juez Marrero Guerrero.

Marrero Guerrero, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 26 de febrero de 2026.

Comparece el señor Rigoberto Mateo Pérez (señor Mateo Pérez o apelante) y solicita la revisión de una *Sentencia* emitida y notificada el 1 de octubre de 2025 por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI).[1] Mediante dicho dictamen, el foro primario declaró Ha Lugar la *Demanda* presentada por el señor Phillip Ruiz Lugo (señor Ruiz Lugo o apelado) por incumplimiento de contrato y daños. En consecuencia, ordenó el otorgamiento de la escritura de compraventa conforme al precio convenido, además del pago por angustias mentales y otros costos relacionados al litigio.

Por los fundamentos que se exponen a continuación, se modifica la *Sentencia* apelada.

**I.**

Este caso se originó el 30 de agosto de 2023, cuando el señor Ruiz Lugo presentó una *Demanda* por incumplimiento contractual y daños contra el señor Mateo Pérez.[2] En la misma, alegó que el apelante, dueño de un inmueble ubicado en San Juan, Puerto Rico,

---

[1] Entrada Núm. 72 del caso SJ2023CV08315 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).
[2] *Íd.*, Entrada Núm. 1 en SUMAC.

acordó verbalmente en mayo de 2018 venderle la propiedad por $150,000.00. Adujo que, como parte de los acuerdos, entregaría $4,500.00 como pronto y efectuaría pagos adicionales, según fueran requeridos, acreditables al precio pactado, incluyendo unas sumas destinadas a sufragar la boda de la hija del señor Mateo Pérez.

Esgrimió que, el 21 de mayo de 2018, entregó un cheque de $4,500.00 en concepto de pronto, aceptado y firmado por el apelante. Sostuvo que, posteriormente, realizó pagos periódicos que ascendieron a $46,522.44, restando un balance de $103,477.56. Arguyó que el 25 de julio de 2023, se comunicó con el demandado para coordinar el pago del balance y el otorgamiento de la escritura. No obstante, señaló que este se retractó del acuerdo al manifestar que debía tasar previamente la propiedad, pese a lo ya convenido. Ante esta circunstancia, se presentó la demanda en la que solicitó que se le ordenara al demandado otorgar la escritura de compraventa conforme al precio pactado de $150,000.00, acreditando los pagos efectuados; así como el pago de $25,000.00 por daños y $10,000.00 por honorarios de abogados.

El 15 de noviembre de 2025, el señor Mateo Pérez presentó su *Contestación a Demanda,* en la que negó las alegaciones y aseveró que nunca se pactó el precio de compraventa.[3] A su vez, esbozó que las sumas recibidas correspondían a un préstamo sin fecha de vencimiento para su pago.

Tras varios incidentes procesales, el juicio en su fondo se celebró los días 17 y 31 de julio de 2025 y 25 de septiembre de 2025.[4] A continuación, se sintetizan los testimonios vertidos:

**Phillip Ruiz Lugo:**

---

[3] *Íd.,* Entrada Núm. 10 en SUMAC.
[4] *Íd.,* Entradas Núm. 64, 68 y 71 en SUMAC.

El señor Ruiz Lugo declaró que, en 2018, el señor Mateo Pérez acudió a él por necesidades económicas.[5] Relató que, tras evaluar distintas alternativas, surgió el asunto de la residencia del señor Mateo Pérez en Cupey.[6] Atestó que, acordaron otorgar la escritura de la propiedad a cambio de un pronto e iniciar el trámite, comprometiéndose a remitirle dinero conforme lo necesitara.[7] Además, agregó que a medida que el señor Mateo Pérez lo necesitara, le enviaría dinero.[8] Sostuvo que pactaron verbalmente la venta de la propiedad por $150,000.00 y un pronto de $4,500.00 y entregas adicionales según era solicitado mediante textos, llamadas telefónicas o personalmente, acumulando $46,522.44.[9] Reconoció que salvo algunos cheques identificados como pronto, segundo pago, Casa Cupey, los restantes no consignaban que correspondía a una compraventa.[10]

Explicó que hizo la oferta considerando la baja en el mercado inmobiliario, la cual fue aceptada por el señor Mateo Pérez con un apretón de manos.[11] Señaló que, por lo anterior, conservó copia de los cheques y las comunicaciones y que se preparó un desglose de los pagos.[12] Añadió que sus progenitores residían en la propiedad como inquilinos y que estaba pagando $300.00 mensuales, suma que no se acreditaba al precio de la compraventa.[13] Manifestó que, según lo acordado, continuaría pagando la renta hasta culminar la transacción, momento en el cual saldaría el balance.[14] Sin embargo, atestó que cuando notificó que tenía el dinero restante, el señor Mateo Pérez expresó que se iba a retractar el acuerdo, ya que deseaba

---

[5] TPO del 17 de julio de 2025, pág. 16, líneas 12-15.
[6] *Íd.*, líneas 16-25; pág. 17, líneas 1-5.
[7] *Íd.*, pág. 22, líneas 4-6.
[8] *Íd.*, líneas 6-7.
[9] *Íd.*, líneas 8-10; pág. 22, líneas 13-14; pág. 23, líneas 18-25; pág. 24, líneas 17-22; pág. 28, líneas 4-11 y 18-23; pág. 70, líneas 8-11.
[10] *Íd.*, pág. 95, líneas 19-25.
[11] *Íd.*, pág. 27, líneas 15-22; pág. 28, líneas 1-3.
[12] *Íd.*, pág. 32, líneas 1-3.
[13] *Íd.*, pág. 26, líneas 2-9; pág. 71, líneas 13-21.
[14] *Íd.*, pág. 71, líneas 9-12.

conocer el valor real de la propiedad mediante tasación.[15] Indicó que el señor Mateo Pérez le manifestó: "Te di mi palabra, pero necesito saber el valor real de la propiedad" y le solicitó un desglose del balance adeudado para evaluar cómo saldarlo.[16]

Afirmó que esta actuación provocó desunión familiar y se sentía triste y defraudado por el mensaje emitido por el señor Mateo Pérez.[17] Añadió que el apelante debía cumplir con lo convenido, incluyendo el pago del balance adeudado al CRIM para viabilizar la transferencia del inmueble.[18]

### Rigoberto Mateo Pérez

El señor Mateo Pérez declaró que no acordó vender la propiedad al señor Ruiz Lugo.[19] Sostuvo que el cheque de $4,500.00 no correspondía a un pronto, sino que era para su hija.[20] Sin embargo, admitió que en mayo de 2018 firmó un documento titulado "Down Payment Cupey" y que recibió un pago de $4,500.00.[21] Atestó que posteriormente percibió otros pagos, ascendentes a no menos de $41,700.00.[22] Negó haber pactado un precio de $150,000.00 y afirmó que el valor convenido era $255,000.00.[23] Indicó que, cuando el señor Ruiz Lugo le comunicó que estaba listo para otorgar la escritura y saldar el balance pendiente de $97,000.00, respondió que procedía tasar la propiedad.[24] Admitió que entonces se retractó de vender el inmueble en $150,000.00 —cantidad que originalmente se acordó— debido al alza en el mercado.[25] A saber, aceptó que indicó lo siguiente al apelado: "el precio que yo acordé contigo eran $150,000.00, no puede ser ahora porque las propiedades han aumentado de valor".[26]

---

[15] *Íd.*, pág. 72, líneas 7-15; pág. 73, líneas 1-16.
[16] *Íd.*, pág. 73, líneas 1-24.
[17] *Íd.*, pág. 81, líneas 15-20.
[18] *Íd.*, pág. 79, líneas 9-18.
[19] TPO del 25 de septiembre de 2025, pág. 8, líneas 3-11.
[20] *Íd.*, líneas 12-14.
[21] *Íd.*, pág. 10, líneas 6-17.
[22] *Íd.*, líneas 20-25; pág. 11, líneas 1-12; líneas 24-25; pág. 12, líneas 3-11.
[23] *Íd.*, pág. 12, líneas 15-21.
[24] *Íd.*, pág. 13 líneas 15-19.
[25] *Íd.*, líneas 21-25; pág. 14, líneas 1-25; pág. 15, líneas 1-23.
[26] *Íd.*, pág. 16, líneas 6-14.

Añadió que, tras la tasación, solicitó un precio distinto, lo cual fue rechazado por el señor Ruiz Lugo por no ajustarse a lo previamente acordado.[27] Señaló que cuando recibió el inmueble en herencia, el mismo se valoró en $255,000.00.[28] Además, manifestó que existía una diferencia de $105,000.00 entre el valor del inmueble y el precio reclamado por el señor Ruiz Lugo, razón por la cual se arrepintió de la transacción.[29]

El 1 de octubre de 2025, el TPI emitió y notificó su *Sentencia*, en la que consignó las siguientes determinaciones de hechos:[30]

1. La Parte Demandada es dueña de la propiedad ubicada en la Urbanización Oasis de Cupey U-11 San Juan, Puerto Rico (en adelante, la "Propiedad"), descrita como:

"URBANA: Solar Marcado con el número once (11) del Bloque U de la Urbanización Oasis de Cupey, localizado en el Barrio Cupey del Municipio de Río Piedras, San Juan, Puerto Rico, con un área de cero punto tres tres ocho dos (0.3382), cuerdas equivalente a mil trescientos veintinueve punto treinta y nueve metros cuadrados (1,329.39 m.c.), en lindes por el Norte en veinticinco (25) metros con calle uno Arcadio Hernández; por el Sur en veinticinco (25) metros con la calle uno (1) de la misma urbanización; por el Este en sesenta y seis punto doscientos treinta y ocho (66.238) metros, con los solares siete (7), ocho (8) y nueve (9); y por el Oeste con Camino Alejandro, afecta por su procedencia a servidumbre de paso a favor de la Autoridad de Energía Eléctrica de Puerto Rico. Número de Catastro: UNO UNO CINCO GUION CERO SEIS CUATRO GUIÓN CUATRO DOS CERO GUIÓN CINCO TRES GUIÓN CERO CERO CERO (115-064-420-53-000)."- Inscrita al Folio ciento diez (110) del tomo ciento veinticuatro (124) de Río Piedras Sur, Finca número quince mil trescientos noventa y siete (15,397) en el Registro de la Propiedad Sección de San Juan IV.

2. Las partes de epígrafe son cuñados, por estar casada la Parte Demandada con la hermana de la Parte Demandante.

3. La Propiedad fue adquirida por la Parte Demandada en pago de la herencia su padre Santos Mateo Negrón mediante la Escritura Pública número dos (2) sobre Partición Hereditaria y Adjudicación de Participaciones otorgada el día tres (3) de septiembre de dos mil catorce (2014) ante la Notario Público Ana R. Mellado González en San Juan, Puerto Rico.

4. Según surge de la Certificación Registral de la Propiedad, marcado como Exhibit núm. 2 en cuanto a su autenticidad y contenido, la Parte Demandada es titular del dominio de la Propiedad por Adjudicación y Partición de Herencia, valorada en la suma de $255,000.00 en virtud de la escritura 02 del 03 de septiembre de 2014 otorgada en San Juan ante la Notario Ana R. Mellado González, según inscripción 5ª al TOMO KARIBE de RÍO PIEDRAS SUR.

5. Para el año 2018, la Parte Demandada le indica a la Parte Demandante que tenía unas situaciones económicas que

---

[27] *Íd.*, líneas 22-25; pág. 18, líneas 1-22.
[28] *Íd.*, pág. 19, línea 25; pág. 20, líneas 1-3.
[29] *Íd.*, pág. 22, líneas 1-5; pág. 24, líneas 5-9.
[30] *Íd.*, Entrada Núm. 72 en SUMAC.

incluían la boda de la hija de la Parte Demandada y otras cosas personales, por lo que necesitaba dinero.

6. Como consecuencia de la situación esbozada en el hecho núm. 4, para mayo de 2018 las partes acordaron verbalmente que la Parte Demandada vendería la Propiedad a la Parte Demandante por la suma de $150,000.00.

7. Como parte de lo pactado entre las Partes, la Parte Demandante le adelantaría a la Parte Demandada la suma de cuatro mil quinientos dólares ($4,500.00) como pronto pago por la Propiedad y que de tiempo en tiempo, según los fuera solicitando, se le iba a estar emitiendo pagos que serían acreditados al monto adeudado, hasta tanto la Parte Demandante pudiera reunir el total adeudado para pagarlo y otorgar la escritura de compraventa.

8. El 21 de mayo de 2018, la Parte Demandante le entregó un cheque de cuatro mil quinientos dólares ($4,500.00) a la Parte Demandada como pronto pago por la Propiedad, el cual fue aceptado por la Parte Demandada y firmado su talonario.

9. La Parte Demandada le solicitaba a la Parte Demandante los pagos mediante mensajes de texto, llamadas telefónicas y/o personalmente.

10. A petición de la Parte Demandada, la Parte Demandante le hizo varios pagos a la parte Demandada por medio de cheques y pago en efectivo.

11. Los pagos realizados por la Parte Demandante provenían de cuentas bancarias de entidades de las cuales la Parte Demandante era el único dueño.

12. La Parte Demandada había acordado con la Parte Demandante que asumiría el pago del CRIM.

13. Los pagos emitidos por la Parte Demandante acumularon un balance de cuarenta y seis mil quinientos veintidós dólares con cuarenta y cuatro centavos ($46,522.44).

14. Los pagos por la cantidad de $46,522.44 se acreditaron al precio de compraventa, quedando pendiente de pago la suma de ciento tres mil cuatrocientos setenta y siete dólares con cincuenta y seis centavos ($103,477.56).

15. Las Partes habían acordado que en cuanto la Parte Demandante tuviera el dinero completo para pagar la cantidad restante, se lo pagaría a la Parte Demandada.

16. Las Partes acordaron que mientras la Parte Demandante obtuviera el remanente para completar el pago de la Propiedad, seguiría pagando la renta de $300.00, para que la Parte Demandada tuviera un ingreso.

17. La cantidad de $300.00 por pago de renta no se dedujo del precio de venta acordado.

18. El 25 de julio de 2023, la Parte Demandante se comunicó con la Parte Demandada para coordinar el pago del balance adeudado y poder otorgar la escritura de compraventa.

19. El 26 de julio de 2023, la Parte Demandada le escribió un mensaje de texto donde le indica que quería hacer una tasación de la Propiedad.

20. En el mensaje de texto del 26 de julio de 2023, una vez indica que quiere tasar la Propiedad, la Parte Demandada le indica a la Parte [Demandante]: "[...] esa es la que hay te di mi palabra pero necesito saber el valor real de la propiedad [...]".

21. La Parte Demandante no exigió un contrato por escrito u otras formalidades de un negocio, al ser la Parte Demandada familia de la Parte Demandante.

22. La situación generada por no completarse la transacción entre la Parte Demandante y Demandada creó problemas en la familia y causó tristeza al demandante Phillip Ruiz Lugo por las acciones del demandado Rigoberto Mateo Pérez.

Conforme a lo anterior, el foro primario concluyó que los actos

de las partes evidenciaron la intención de perfeccionar el contrato de

compraventa, por lo cual no halló justificación para la negativa del señor Mateo Pérez a cumplir lo pactado. Determinó, además, que tras escuchar el testimonio del apelado y observar su comportamiento, se evidenció que sufrió daños morales y angustias mentales previsibles a raíz del incumplimiento y de la negativa a permitirle acceso a la propiedad. Por ello, fijó una compensación por daños emocionales y angustias mentales en $15,000.00. Asimismo, resolvió que no se justificó para que el apelante incumpliera con su obligación ni la prolongación innecesaria del pleito por casi dos (2) años, por lo que impuso $5,000.00 en honorarios de abogado por temeridad. Señaló que el apelante inicialmente calificó el negocio como un préstamo y luego alegó una simulación disimulada, pese a que la prueba evidenció el incumplimiento de la compraventa pactada, su admisión de haber dado su palabra y su posterior retractación, lo que generó un litigio evitable y obligó al apelado a incurrir en gastos innecesarios.

En consecuencia, declaró Ha Lugar la *Demanda* y ordenó al señor Mateo Pérez a otorgar la escritura de compraventa por el precio pactado de $150,000.00, acreditando $46,522.44 ya satisfechos; y suscribir los instrumentos necesarios para su cumplimiento. Dispuso que, de no hacerlo dentro de veinte (20) días de advenir final y firme la Sentencia, el Alguacil comparecería en su sustitución para formalizar los trámites correspondientes. Además, le ordenó el pago de $15,000.00 por daños emocionales, $5,000.00 por honorarios de abogados, más las costas y los gastos del litigio.

Inconforme, el 29 de octubre de 2025, el señor Mateo Pérez presentó este recurso y planteó que el TPI incidió en lo siguiente:

> **PRIMER ERROR**: COMETIÓ ERROR EL TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR HA LUGAR LA DEMANDA Y RESOLVER QUE ENTRE LAS PARTES SE HABÍA PERFECCIONADO UN CONTRATO DE COMPRAVENTA POR LA SUMA DE $150,000.00, A PESAR DE QUE PARA EL AÑO 2014 LA PROPIEDAD EN CONTROVERSIA ESTABA VALORADA EN $255,000.00 Y, POR ENDE, LAS PARTES LO QUE LLEVARON A CABO FUE UN ACUERDO DIRIGIDO A REALIZAR UNA DONACIÓN DISIMULADA QUE NO SE REALIZÓ CONFORME A

DERECHO DEBIDO A QUE NO CUMPLÍA CON LOS REQUISITOS FORMALES DE LEY. COMO CONSECUENCIA DE DICHO INCUMPLIMIENTO, LA PARTE DEMANDANTE ESTABA IMPEDIDA DE RECLAMAR EL CUMPLIMIENTO DE UN CONTRATO DE COMPRAVENTA Y, A LO SUMO, LA ÚNICA CAUSA DE ACCIÓN DISPONIBLE ES QUE SE ESTABLEZA UN PLAZO DE VENCIMIENTO DEL DINERO PRESTADO A LA PARTE DEMANDADA, AQUÍ APELANTE.

**SEGUNDO ERROR**: ERRÓ EL FORO DE INSTANCIA AL DECLARAR HA LUGAR LA RECLAMACIÓN EN DAÑOS POR ANGUSTIAS MENTALES Y FIJAR UNA COMPENSACIÓN DE $15,000.00 A BASE DE MERAS CONJETURAS Y, POR TANTO, DE UNA PRUEBA INSUFICIENTE.

Tanto en su escrito principal como en su alegato suplementario, el apelante sostuvo que el foro primario erró al concluir que en mayo de 2018 se perfeccionó un contrato de compraventa y que la escritura se otorgaría una vez el apelado reuniera el dinero. Argumentó que, de ser así, este tardó cinco (5) años en hacerlo. Señaló que en 2014, la propiedad se tasó en $255,000.00 y que venderla en $150,000.00, sin fecha cierta de pago, implicaría una donación disimulada de $105,000.00, de la cual se retractó. Adujo que dicha transacción carecía de validez por no constar en escritura pública ni mediar aceptación del donatario.

En cuanto a los daños, alegó que el testimonio del señor Ruiz Lugo fue vago e insuficiente, sin prueba de insomnio, pérdida de apetito, falta de concentración, tratamiento psicológico o conflictos familiares, por lo que no cumplió con la carga probatoria para acreditar los daños morales. Indicó que el apelado sufrió una mera molestia no compensable como daño moral, por lo que el TPI partió de la premisa errónea de que todo incumplimiento generaba daños.

Por su parte, en sus escritos, el señor Ruiz Lugo esgrimió que la teoría de donación disimulada no se planteó en la *Contestación a Demanda* ni se sustentó con la prueba y que surgió tardíamente en etapas apelativas. Señaló que el apelante admitió el acuerdo verbal de compraventa y que se retractó al entender que la propiedad aumentó de valor. Respecto a los daños, aseveró que detalló el

impacto de la actuación del apelante en su núcleo familiar y que se le privó de su derecho sobre la propiedad.

Finalmente, sostuvo que el apelante litigó con temeridad, incluso en la etapa apelativa, aduciendo que, de forma temeraria, obstinada y contumaz, persistió en alegar un planteamiento al que renunció y que no tenía respaldo en la prueba desfilada. Por ello, solicitó no menos de $10,000.00, adicionales a los $5,000.00 concedidos por el TPI.

## II.

### A. Apreciación de la prueba

Como foro revisor, se debe examinar si el tribunal de instancia aplicó correctamente el derecho a los hechos del caso. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Para cumplir con ello, es indispensable que el foro primario desarrolle un expediente completo con determinaciones de hechos sustentadas en la prueba desfilada. *Íd.* Pues, a diferencia del tribunal inferior, un foro apelativo no celebra juicios plenarios, no observa el testimonio oral, ni dirime la credibilidad. *Íd.*

No obstante, ante prueba documental, pericial o testimonial ofrecida mediante declaración escrita, este tribunal apelativo se encuentra en igual posición que el de instancia. *Ortiz et al. v. SLG Meaux*, 156 DPR 488, 495 (2002). De igual modo, las conclusiones de derecho son revisables en su totalidad por este tribunal. *Dávila Nieves v. Meléndez Marín, supra*, pág. 770. Ahora bien, como norma general, los tribunales apelativos consideramos correctas las determinaciones de hechos y la apreciación de la credibilidad de los testigos realizadas por el foro primario. *Íd.*, pág. 771. Por esta razón, la intervención de este tribunal apelativo en la revisión de la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos solo procede ante error manifiesto, pasión, prejuicio o parcialidad. *WMM, PFM et al. v. Colegio et al.*, 211

DPR 871 (2023); *Pueblo v. Hernández Doble,* 210 DPR 850, 866 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

### B. Contratos

Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes y deben cumplirse conforme a lo pactado. Art. 1044 del Código Civil de 1930, 31 LPRA sec. 2994.[31] Un contrato surge desde que una o más personas consienten en obligarse a dar algo o prestar un servicio. Art. 1206 del Código Civil, *supra*, sec. 3371; *Rodríguez Ramos et al. v. ELA et al.*, 190 DPR 448, 455 (2016). Los contratantes pueden fijar los pactos, las cláusulas y las condiciones que estimen convenientes, siempre que no contravengan la ley, la moral ni el orden público. Art. 1207 del Código Civil, *supra*, sec. 3372. Asimismo, la validez ni el cumplimiento de la obligación contractual pueden dejarse al arbitrio de uno de los contratantes. Art. 1208 del Código Civil, *supra*, sec. 3373; *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 994-995 (2024).

Para su eficacia, el contrato requiere consentimiento, objeto cierto y causa. *Íd.*, pág. 995; Art. 1213 del Código Civil, *supra*, sec. 3391. Ante esto, los contratos se perfeccionan por el mero consentimiento y, desde entonces, obligan a lo expresamente pactado y a las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, *supra*, sec. 3375.

Cuando los términos son claros, prevalece su sentido literal; si resultan ambiguos, rige la intención evidente de los contratantes. Art. 1233 del Código Civil, *supra*, sec. 3471; *Municipio Mayagüez v. Lebrón,* 167 DPR 713 (2006). Para ello, el tribunal debe atender los actos anteriores, coetáneos y posteriores al contrato, así como las circunstancias indicativas de la voluntad de las partes. Art. 1234 del

---

[31] Se hace referencia al Código Civil derogado, por sus disposiciones estar vigentes al momento de los hechos que dieron origen a la controversia.

Código Civil, *supra*, sec. 3472; *Blas v. Hosp. Guadalupe*, 167 DPR 439 (2006); *Merle v. West Bend Co.*, 97 DPR 403 (1969).

### C. Daños

Nuestro ordenamiento reconoce dos (2) tipos de daños: los pecuniarios o económicos y los morales, que comprenden los sufrimientos y las angustias mentales. *Colón v. Glamorous Nails*, 167 DPR 33, 50 (2006); *Cintrón Adorno v. Gómez*, 147 DPR 576, 587 (1999). La indemnización por un daño moral puede surgir tanto del incumplimiento contractual como de la violación del deber general de diligencia consagrado en el Artículo 1802 del Código Civil, *supra*, sec. 5141; *Colón v. Glamorous Nails*, *supra*, págs. 50-51.

Sin embargo, en materia contractual, solamente procede la indemnización de los sufrimientos y las angustias mentales probados, siempre que fueran previsibles al momento de constituirse la obligación y constituyan consecuencia necesaria del incumplimiento. *Muñiz-Olivari v. Stiefel Labs.*, 174 DPR 813, 821 (2008); *Colón v. Glamorous Nails*, *supra*, pág. 51.

### D. Temeridad

Por otra parte, el inciso (d) de la Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1 (d), faculta al TPI a imponer honorarios de abogado cuando una parte procedió con temeridad durante el litigio. *Pereira v. IBEC*, 95 DPR 28 (1967). La temeridad se define como una conducta terca, obstinada, contumaz y carente de fundamento que obliga a la parte contraria a asumir los gastos y el esfuerzo de un litigio que pudo evitarse o que se prolongó innecesariamente. *Marrero Rosado v. Marrero Rosado*, 178 DPR 476, 504 (2010); *SLG Flores-Jiménez v. Colberg*, 173 DPR 843, 866 (2008). Ello, salvo que la controversia implique una cuestión de derecho novedosa. R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 6ta. ed., LexisNexis, San Juan, 2017, pág. 437. Empero, el hecho de que un asunto no se haya planteado previamente no implica

falta de temeridad si la ley aplicable es clara. J. A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Publicaciones JTS, 2011, T. IV, pág. 1312.

El propósito de esta sanción es desalentar litigios infundados y promover la resolución de controversias, mediante un mecanismo que compense a la parte prevaleciente por los perjuicios económicos y las cargas generadas por la actitud irrazonable de su contraparte. *Marrero Rosado v. Marrero Rosado, supra.* Además, castiga a quien, por su actitud inflexible, obliga a la otra a incurrir en los inconvenientes de un pleito. *Torres Vélez v. Soto Hernández*, 189 DPR 972, 993 (2013); *COPR v. SPU*, 181 DPR 299 (2011). La determinación de temeridad recae en la sana discreción del juzgador, sujeta a revisión apelativa en caso de abuso de discreción. *COPR v. SPU, supra*; *SLG Flores-Jiménez v. Colberg, supra.*

De otra parte, la Regla 85 del Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 141, 217 DPR __ (2025), dispone que, si este Tribunal determina que el recurso es frívolo o se presentó con fines dilatorios, podrá denegarlo o desestimarlo e impondrá a la parte promovente o a su representante legal las costas, los gastos, los honorarios de abogados y la sanción económica que estime apropiada, la cual deberá reflejar el costo de la dilación ocasionado a la parte opositora.

**III.**

En el caso de marras, la controversia se centró en si las partes perfeccionaron en mayo de 2018 un contrato verbal de compraventa por la suma de $150,000.00, con un pronto de $4,500.00 y pagos posteriores acreditables al precio, o si, como adujo el apelante, lo ocurrido constituyó una donación disimulada o, en su defecto, un préstamo. Además, el señor Mateo Pérez argumentó que el TPI erró al conceder $15,000.00 por daños morales y angustias mentales, por entender que se basó en meras conjeturas y prueba insuficiente. De

igual modo, cuestionó la imposición de honorarios por temeridad y sugirió que la causa de acción, a lo sumo, debía limitarse a fijar un vencimiento para el dinero prestado. A la luz de una evaluación integral del expediente, concluimos que no le asiste la razón al apelante en cuanto a la inexistencia de un contrato de compraventa, y concluimos que la prueba testifical y documental considerada por el Foro Primario avalan la determinación de temeridad plasmada en la Sentencia. Sin embargo, consideramos que no presentó prueba suficiente para avalar la imposición de una partida por concepto de daños, por lo que dejamos sin efecto dicha parte de la *Sentencia* apelada.

Conforme a la prueba vertida y las determinaciones de hecho consignadas por el foro primario, para mayo de 2018, las partes acordaron verbalmente que el apelante vendería el inmueble en controversia al apelado por $150,000.00 y que se adelantarían ciertas sumas hasta completar la suma pendiente y otorgar la escritura. A lo largo del tiempo, y tras múltiples solicitudes por parte del demandado, los pagos totalizaron $46,522.44. Surgió que, posteriormente, el apelado se comunicó para coordinar el pago del balance y el otorgamiento de la escritura y que el apelante le respondió que quería tasar la propiedad, expresando, entre otras cosas, "esa es la que hay, te di mi palabra, pero necesito saber el valor real de la propiedad". Estas determinaciones, sustentadas en la prueba desfilada, merecían deferencia en revisión apelativa, y el apelante no demostró error manifiesto, pasión, prejuicio o parcialidad que justificara su intervención.

Más contundente aún resultó el testimonio del propio apelante, quien confirmó la existencia del acuerdo de compraventa y la razón del incumplimiento. A saber:

> [...]
> [Abogado]: [...] Mire a ver si usted no había acordado con don Phillip venderle esa casa de Cupey en $150,000.00.

[Apelante]: No

[…]

[Apelante]: Eran doscientos cincuenta y cinco.

[Abogado]: Eran doscientos cincuenta y cinco. ¿Eso es lo que usted dice aquí bajo juramento?

[Apelante]: Correcto.

[…]

[Abogado]: […] Mire a ver si don Phillip le llamó a usted y le escribió y le dijo "Mira, ya estoy 'ready' para hacer la compraventa, tengo los $97,000.00 que te debo, vamos a hacer las escrituras". ¿Verdad que sí?

[Apelante]: Correcto.

[Abogado]: Correcto. Y en ese momento usted se retractó de vender en $150,000. ¿Verdad que sí?

[Apelante]: Correcto.

[Abogado]: Correcto. Porque originalmente usted había acordado $150,000. ¿Verdad que sí?

[Apelante]: Si. Pero la venta era…

[…]

[Abogado]: Mire, don Rigoberto, y lo cierto es que usted acaba de declarar que en un origen usted acordó $150,000. ¿Sí?

[Apelante]: Sí.

[Abogado]: Sí. Y posterior a eso, usted decidió retractarse, cuando don Phillip le dijo que ya tenía el balance para saldarse los noventa y siete que le debía. ¿Verdad que sí?

[Apelante]: No.

[Abogado]: ¿No? Mire, mire a ver si yo le pregunté en esa deposición que usted compareció, "Pero le dijo 'voy a darte los $97,000, que es lo que tenemos', verdad que sí?" y usted contestó "correcto". ¿verdad que usted contestó eso en mi oficina?"

[Apelante]: Correcto.

[Abogado]: Correcto. Y después se le preguntó "Vamos a hacer las escrituras, ya tengo disponible los noventa y siete". Y usted vuelve y me contesta "correcto". ¿Verdad que sí?

[Apelante]: Correcto.

[Abogado]: Correcto. Y después le pregunto, "Y en ese momento es que usted le indica 'sorry', pero voy a tasar". ¿Verdad que sí?

[Apelante]: Correcto.

[…]

[Abogado]: Se le pregunta "Y el precio que yo acordé contigo eran $150,000, no puede ser ahora porque las propiedades han aumentado de valor y esto viene […]". Y esa fue su contestación. ¿Verdad que sí?

[Apelante]: Correcto.

[Abogado]: Y eso fue lo que usted le dijo a don Phillip en el momento en que se retractó. ¿Verdad que sí?

[Apelante]: Correcto.

[…]

[Abogado]: Por lo tanto, ¿usted está admitiendo aquí bajo juramento que en ese momento usted se retractó del precio que habían acordado?

[Apelante]: Correcto.

[…]

[Abogado]: Correcto. Porque según usted ahora tasa $200,000, ¿verdad que sí? Con la voz.

[Apelante]: Correcto.

[Abogado]: Correcto. Distinto a lo que usted había acordado previamente. ¿Verdad que sí?

[Apelante]: Correcto.

[…]

[Abogado]: Mira, lo cierto es que en ese momento es que don Phillip le dice "Ese no fue el acuerdo que llegamos". ¿Verdad que sí?

[Apelante]: Correcto.[32]

Del referido testimonio surgió que existió un acuerdo de compraventa por precio cierto y que la negativa del apelante a consumarlo obedeció a un cambio unilateral de postura motivado por el alza del mercado inmobiliario y la intención de tasar para conocer el valor real.

Lo anterior derrota completamente la teoría de donación disimulada. De los hechos probados no surgió ánimo de liberalidad ni transmisión gratuita alguna, sino una obligación recíproca de transferir la propiedad a cambio de un precio pactado. El hecho de que el inmueble hubiese sido valorado en $255,000.00 al recibirse en herencia no convirtió automáticamente la compraventa en donación, máxime cuando el propio apelante reconoció que, en un origen, aceptó el precio de $150,000.00 y solo se retractó cuando el apelado procuró saldar el balance y formalizar la escritura. En igual dirección, tampoco nos convence el planteamiento de una transacción de préstamo, puesto que las sumas se acreditaron al precio de compraventa y la conducta de las partes evidenció la intención de perfeccionar ese contrato, sin que la validez o el cumplimiento pudieran quedar al arbitrio de uno de los contratantes. Así las cosas, concluimos que el primer señalamiento de error carece de mérito.

En cuanto a los daños, el foro *a quo* determinó que, tras escuchar el testimonio del apelado y observar su comportamiento, se evidenció que sufrió daños morales y angustias mentales previsibles como consecuencia del incumplimiento y de la negativa a permitirle acceso a la propiedad. Además, consignó como hecho que la situación creó problemas en el entorno familiar y causó tristeza al señor Ruiz Lugo. Al respecto, es menester puntualizar que de ordinario corresponde otorgar deferencia a la apreciación del foro primario

---

[32] TPO del 25 de septiembre de 2025, págs. 12-18.

respecto a la credibilidad y al peso de la prueba testifical. Sin embargo, dicho deber de deferencia no es absoluto, y consideramos que la prueba desfilada no superó el *quantum* o grado de prueba necesario para avalar decretar probada la acción en daños y, en consecuencia, imponer una cuantía en base a lo anterior. Por tanto, concluimos que el segundo error señalado se cometió.

Finalmente, en lo relativo a la temeridad, el TPI determinó que no existió justificación para el incumplimiento ni para mantener un litigio innecesario por casi dos (2) años, e impuso $5,000.00 en honorarios por la temeridad demostrada. Señaló, además, que el apelante inicialmente calificó el negocio como un préstamo y luego alegó una teoría distinta de donación disimulada, pese a que la evidencia demostró el incumplimiento de la compraventa pactada, su admisión de haber dado su palabra y su posterior retractación. Tal y como se desprende de nuestra conclusión sobre el primer señalamiento de error, a la luz de los hechos particulares previamente consignados, coincidimos con la apreciación del TPI sobre la temeridad incurrida por el apelante, por lo que no intervendremos con la determinación de imponerle el pago de honorarios de abogado a dicha parte.

Ahora bien, en esta etapa apelativa, el apelante ha insistido en planteamientos incompatibles con los hechos demostrados en el foro primario y con sus propias admisiones bajo juramento sobre el asunto central de la controversia, particularmente la aceptación de que el precio inicialmente acordado fue $150,000.00 y que se retractó de ese precio cuando el apelado se aprestaba a consumar la transacción. En tales circunstancias, y conforme a la Regla 85 del Reglamento del Tribunal de Apelaciones, *supra*, procede imponer honorarios de abogado por temeridad al apelante por la suma de $5,000.00, adicionales a los impuestos por el TPI, por su insistencia

contumaz en replantear controversias que contravenían los hechos probados.

**IV.**

Por los fundamentos que anteceden, se modifica la *Sentencia* apelada, únicamente a fines de revocar la imposición de la partida de $15,000.00 por concepto de daños y angustias mentales. De otra parte, se impone el pago de $5,000.00 por concepto de honorarios de abogado por temeridad en el trámite apelativo. Esta cuantía es independiente y adicional a la impuesta por el Foro Primario.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones